[Nos. 23334-7-II; 23338-0-II. Division Two. September 8, 2000.]

WESTERN WASHINGTON CORPORATION OF SEVENTH-DAY
ADVENTISTS, *Respondent*, v. FERRELLGAS, INC., ET AL.,
*Appellants*.

490

*Mark C. Scheibmeir* (of *Hillier & Scheibmeir, P.S.*) (*Louis Huber* and *Barbara Corbin* of *Schlee Huber McMullen & Krause*, of counsel), and *Eileen M. Stauss* (of *Law Offices of Eileen Stauss*), for appellants.

*R. Daniel Lindahl*, and *Jeffrey G. Frank* (of *Bullivant Houser Bailey*), for respondent.

ARMSTRONG, C.J. — The Western Washington Corporation of Seventh-Day Adventists (the Church) sued its heating contractor and its propane supplier for fire damage to its partially constructed building. The suit was brought on behalf of the Church's property insurer, who claimed subrogation rights against the allegedly negligent heating contractor, Art & Sons, Inc., and the propane supplier, Ferrellgas, Inc. Art & Sons and Ferrellgas each moved for summary judgment, arguing that the insurer had no subrogation rights (1) because Art & Sons and Ferrellgas are co-insureds under the insurance policy, and (2) because the Church waived subrogation rights by contract. The Church also moved for partial summary judgment, seeking dismissal of these defenses. The trial court granted summary judgment for Art & Sons, concluding that its trade contract with the Church incorporated by reference a subrogation waiver. The Church appeals.

The trial court also granted the Church's motion for

summary judgment against Ferrellgas. The court concluded that Ferrellgas was not a third party beneficiary of the Church's agreement with its architect, which Ferrellgas contends incorporates by reference a waiver of subrogation in favor of contractors. The trial court also concluded that Ferrellgas was not a co-insured under the Church's policy. Ferrellgas appeals. We affirm.

## FACTS

The Church sued both Art & Sons and Ferrellgas for negligence and breach of contract. The suit was brought on behalf of Adventist Risk Management, which claims a subrogation interest in any recovery. Adventist Risk Management paid $1,847,567.27 to the Church for damages caused by the fire.

In 1992, the Church contracted with architect Russ Hasse to design the church. The contract is AIA Document B141, entitled "Standard Form of Agreement Between Owner and Architect" (the Owner/Architect Agreement). Under the Owner/Architect Agreement, Hasse was required to prepare construction documents—drawings and specifications setting forth the requirements for construction of the project. And, he was required to administer the contract as set forth in "AIA Document A201, General Conditions of the Contract for Construction."

The Owner/Architect Agreement also provides that "[t]erms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction." AIA Document A201 includes "Waivers of Subrogation," under which the owner, all contractors, and subcontractors agree to waive their rights of subrogation against each other.

As required by the Owner/Architect Agreement, Hasse prepared a project manual and specifications (the Project Manual). The Project Manual included a section entitled "Division 1 - General Requirements." Paragraph 1.2 of this section provides: "General Conditions of the Contract for

the Construction of Buildings (AIA Document A201) is a part of this specification."

In June 1994, the Church entered into a "Project Management/Superintendent Agreement" with Tex Ladish, a registered general building contractor. Under the agreement, Ladish was required to maintain and organize the job-site, coordinate the subcontractors, order materials, manage the construction schedule, and inspect subcontractors' work. In addition, he was required to select subcontractors with the building committee and prepare and administer contracts between the Church and the subcontractors. Ladish said he may have received a copy of the Project Manual but claims that he did not use it. The Church concedes that Ladish had a copy of the Project Manual.

On September 8, 1994, Art & Sons entered into a "Trade Contract" with Ladish to install a furnace and the associated fans, vents, and ductwork. Under the Trade Contract, Art & Sons was "to perform the Work . . . in accordance with the Project Contract Documents." Article 2, entitled SCOPE OF WORK, further provides: "Trade Contractor agrees . . . to perform and complete such Work in accordance with Contract Documents . . . ." Art & Sons was also required to procure $1,000,000 Comprehensive General Liability insurance, naming the construction superintendent, owner, and architect as additional insureds.

On the same day that Art & Sons' contract was executed, Ladish sent them "Plan Set 14, Spec [sic] Set 14, and Revised Mechanical Plans." The Church admits that Ladish gave Art & Sons the project drawings and mechanical specifications. The following paragraph is included at the beginning of nine separate subsections in the mechanical specifications:

PART I GENERAL

1.01 <u>RELATED DOCUMENTS</u>: The Drawings, Conditions of Contract, and *Division I of Specification Sections* apply to this Section.

(Emphasis added.)

Division I of the specifications expressly incorporates AIA Document A201, which includes the agreement by the owner, contractor, and subcontractors to waive their subrogation rights against each other. But Division I of the specifications was not attached to the Trade Contract or the specifications.

Ferrellgas was both a supplier of gas and a contractor. The mechanical specifications for the exterior gas system provide: "Serving utility shall be responsible for providing and installing the storage tank. This contractor shall be responsible for piping from the tank connection to the building." But Ferrellgas did not have a trade contract with the Church. Instead, its agreement is found in two "Equipment Rent and Gas Sale Agreement[s]" and two invoices, all of which were drafted by Ferrellgas.

The first agreement is for a 500-gallon tank, a construction heater, and miscellaneous equipment. Ladish signed the agreement. Although the agreement states that there are additional terms on the back of the document, the back of the document is not included in the exhibit. An invoice indicates that the 500-gallon tank and equipment were temporary.

The second agreement, on a form identical to the first, is for three 1,000-gallon tanks. Neither the Church nor Ladish signed this document. The additional terms are attached to this agreement and state in part, "Consumer will . . . pay for all loss or damage to, LP gas or equipment owned by [Ferrellgas], except for damage to the leased equipment resulting from ordinary wear and use."

The trial court granted Art & Sons' motion for summary judgment, concluding that the trade contract incorporated the Project Manual, and the Project Manual incorporated AIA Document A201. The Church's summary judgment motion against Art & Sons was dismissed. The court denied Ferrellgas' motion for summary judgment and granted the Church's motion for summary judgment against Ferrellgas, thereby striking Ferrellgas' affirmative defenses.

## ANALYSIS

A. Standard of Review

When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson*, 98 Wn.2d at 437.

B. Does Art & Sons' Trade Contract incorporate by reference the waiver of subrogation in AIA Document A201?

The Church challenges the trial court's conclusion that their Trade Contract with Art & Sons incorporates by reference AIA Document A201, which includes the waiver of subrogation. Whether the parties intended to incorporate AIA Document A201 into the Trade Contract turns on the meaning of the terms "Project Contract Documents" and "Contract Project Documents" in the Trade Contract. Art & Sons argues that these terms include the mechanical specifications, which expressly incorporate Division I of the Project Manual, which expressly incorporates AIA Document A201. We agree.

■ Incorporation by reference allows the parties to "incorporate contractual terms by reference to a separate . . . agreement to which they are not parties, and including a separate document which is unsigned." 11 SAMUEL WILLISTON, THE LAW OF CONTRACTS § 30:25, at 233-34 (Richard A. Lord ed., 4th ed. 1999) (footnotes omitted). "But incorporation by reference is ineffective to accomplish its intended purpose where the provisions to which reference is made do not have a reasonably clear and ascertainable meaning." WILLISTON, *supra*, at 234. Incorporation by reference must be clear and unequivocal. *Santos v. Sinclair*, 76 Wn. App. 320, 325, 884 P.2d 941 (1994). "[I]t must be clear

that the parties to the agreement had knowledge of and assented to the incorporated terms[.]" WILLISTON, *supra*, at 234.

Here, the Trade Contract provides that the work will be performed in accordance with the "Project Contract Documents" or the "Contract Documents." Thus, the Trade Contract clearly and unequivocally incorporates the "Contract Project Documents" and the "Contract Documents." But the question is what do these terms mean.

■■■ A court's purpose in interpreting a contract is to ascertain the parties' intent. *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). Washington courts use the "context rule" of interpretation. *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990). Under this rule, extrinsic evidence may be admissible to give meaning to the contract language. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836, *reconsideration denied* (1999) (citing *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 189, 840 P.2d 851 (1992) (extrinsic evidence illuminates what was written, not what was intended to be written)). Thus, we determine intent "not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" *Scott Galvanizing, Inc. v. Northwest Enviro-Servs., Inc.*, 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993) (quoting *Berg*, 115 Wn.2d at 667 (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973))).

Extrinsic evidence may be used whether or not the contract language is ambiguous. *U.S. Life*, 129 Wn.2d at 569 (citing *Berg*, 115 Wn.2d at 669). But such evidence may not be used (1) to establish a party's unilateral or subjective intent as to the meaning of a contract word or term; (2) to show an intention independent of the instrument; or (3) to vary, contradict, or modify the written word. *Hollis*, 137 Wn.2d at 695-96. When extrinsic evidence is used to inter-

pret a contract, summary judgment is appropriate if only one reasonable inference can be drawn from the extrinsic evidence. *Scott Galvanizing*, 120 Wn.2d at 582 (citing *Berg*, 115 Wn.2d at 668 (citing RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981))).

The Church tried to introduce affidavits from architect, Russ Hasse, and the chairman of the building committee, Bill Hammond, to demonstrate that it did not intend to incorporate a waiver of subrogation into the Trade Contract. The trial court struck these affidavits, and the Church assigns error to this ruling.

Hasse and Hammond said they did not discuss issues relating to waiver of claims or insurance before signing the Owner/Architect Agreement. Hasse said that he used a consultant to draft the standard portions of the Project Manual and that these were similar to portions of a project manual he had used on another project. AIA Document A201 is a standard form used by owners and general contractors. Hasse did not include AIA Document A201 in the job manual, although it was referenced in the instructions to bidders and the general requirements section of the Project Manual. He did not give a copy of AIA Document A201 to the Church.

Hasse said he talked to Ladish about the references to AIA Document A201 in the Project Manual. They discussed that it would not be necessary to use AIA Document A201 if other AIA contract forms were not also being used for the agreements between the Church and the contractors, including Ladish. Hammond said he never discussed waiver or insurance issues with Ladish, other than the requirement that contractors carry $1,000,000 liability insurance. He did not recall any discussions with subcontractors regarding the Owner/Architect Agreement or any AIA contract forms, general contract conditions, or requirements contained in the Project Manual.

The trial court did not err in striking most of the statements in the affidavits because they do not relate to the "circumstances surrounding the making of the contract

[or] the subsequent acts and conduct of the parties to the contract." *Scott Galvanizing*, 120 Wn.2d at 580-81 (quoting *Berg*, 115 Wn.2d at 667 (quoting *Stender*, 82 Wn.2d at 254)). For the most part, Hasse's affidavit concerns the intent of the parties in executing the Owner/Architect Agreement, not the Trade Contract. Hammond's evidence is also inadmissible because he was not a party to the Trade Contract, which was signed by Tex Ladish.

Through these affidavits and Ladish's statement that he did not use the Project Manual, the Church attempts to establish Ladish's subjective intent as to the meaning of the terms "Contract Documents" and "Contract Project Documents." This evidence is not admissible. *Hollis*, 137 Wn.2d at 695-96. But some information in Hasse's affidavit is relevant. That AIA Document A201 is a standard form used by owners and contractors and that it was referenced in the instructions to bidders, suggest that Art & Sons would be aware of the general conditions in this form prior to signing the Trade Contract.

The Church also attempts to show that it abandoned the Project Manual when it hired Ladish as the construction supervisor. It contends that hiring Ladish in this capacity is inconsistent with the terms of the Owner/Architect Agreement. They also argue that Art & Sons' and the Church's conduct shows that they acted in a manner inconsistent with AIA Document A201 because they acknowledged that Ladish was responsible for supervising construction, rather than the architect, as required by the Owner/Architect Agreement. This is a thinly veiled attempt to establish the Church's subjective intent to abandon the Owner/Architect Agreement and, therefore, the Project Manual that the architect created. But even if we accept the argument that this evidence is admissible to show the intent of the parties to the Trade Agreement, the Church's position is not supported by the facts.

Hiring Ladish as construction supervisor is not inconsistent with the Owner/Architect Agreement. The Church contends that, under the Owner/Architect Agreement, the architect was the "contract administrator" and was respon-

sible for virtually all communications between the Church and the contractors. The language of the agreement does not support this statement. Instead, the Owner/Architect Agreement provides that the architect shall prepare the construction documents for approval by the owner. These documents include the drawings and specifications. But the architect is required only to "assist" the owner in preparing the conditions of the contract and the form of the Owner/Contractor Agreement and in obtaining bids from contractors. Nothing in the Owner/Architect Agreement or AIA Document A201 prevents the Church from hiring a general contractor as the construction supervisor. In fact, hiring a general contractor appears to be consistent with both form agreements. And, under AIA Document A201:

> The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation.[1]

It is undisputed that Ladish gave Art & Sons the mechanical specifications. In fact, he gave the specifications to Art & Sons the same day that the Trade Contract was signed. We conclude, therefore, that the mechanical specifications are part of the "Contract Documents." In nine separate subsections of the mechanical specifications, the Church wrote, "The Drawings, Conditions of Contract, and Division I of Specification Sections apply to this Section." It is undisputed that Division I of the Specification incorporates AIA Document A201 and the waiver of subrogation. AIA Document A201 is a standard form used by contractors, and it was referred to in the instructions to bidders. The instruction to bidders stated that AIA documents were available in the architect's office. Further, the Church acknowledges that it is not necessary to attach these

---

1 "When separate contracts are awarded for different portions of the Project . . . the term 'Contractor' in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement."

documents to the Trade Contract or deliver them to Art & Sons to incorporate the document by reference. Based on this evidence, the only reasonable conclusion is that the parties intended to incorporate AIA Document A201 into their contract. The trial court did not err in reaching this conclusion.

C. Does the Owner/Architect Agreement incorporate by reference the waiver of subrogation in AIA Document A201?

 Ferrellgas argues that it is a third party beneficiary of the Owner/Architect Agreement[2] and that the Agreement incorporates by reference the waiver of subrogation in AIA Document A201. The trial court rejected this argument, and so do we because the Owner/Architect Agreement does not incorporate by reference AIA Document A201 in its entirety.

 Ferrellgas contends that sections 2.4.2, 2.6.2, 9.2, and 9.4 of the Owner/Architect Agreement clearly show that the provisions of AIA Document A201 are necessary to understand the meaning of contract terms and the architect's contractual duties. That is an accurate statement but does not show that AIA Document A201 was wholly incorporated into the Owner/Architect Agreement. "[W]here incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes." WILLISTON, *supra*, at 238.

The Church is correct that the Owner/Architect Agreement does not incorporate AIA Document A201 in its entirety. First, section 2.4.2 does not refer to AIA Document A201.[3] Second, section 2.6.2 provides: "The Architect shall provide administration of the Contract for Construction as

---

[2] To create a third party beneficiary contract, "the *parties [must] intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract.*" *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 886, 719 P.2d 120 (1986) (quoting *Postlewait Constr., Inc. v. Great Am. Ins. Cos.*, 41 Wn. App. 763, 765, 706 P.2d 636 (1985), *aff'd*, 106 Wn.2d 96, 720 P.2d 805 (1986)).

[3] The section provides: "The Architect shall assist the Owner in the preparation of the necessary bidding information, bidding forms, the Conditions of the Contract, and the form of Agreement between the Owner and Contractor."

set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction . . . ." But the provisions for administration of the construction contract in both the Owner/Architect Agreement and in AIA Document A201 do not involve issues of insurance or the waiver of subrogation.

Third, under section 9.2, "[t]erms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction." However, this does not unequivocally state that all conditions of the contract are incorporated into the document. "Term" is defined as "[a] word or phrase; an expression; particularly one which possesses a fixed and known meaning in some science, art, or profession."[4] BLACK'S LAW DICTIONARY 1470 (6th ed. 1990). And as the Church points out, AIA Document A201 defines many terms common to both documents, including the contract documents, the work, the project, the drawings, the specifications, and the Project Manual.[5]

Fourth, section 9.4 provides:

> The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in . . . AIA Document A201, General Conditions of the Contract for Construction[.] The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

---

[4] Ferrellgas states that "terms of" refers to "a condition in a contract, instrument, agreement, etc." But here the contract does not simply refer to terms generally. Instead, it provides that terms "shall have the same meaning" as in AIA Document A201.

[5] Ferrellgas contends that the Church admitted that the general conditions of the contract were incorporated into the Owner/Architect Agreement and, therefore, its position on appeal is inconsistent with its admission. But the admission is not exactly clear. The Church admitted that "[t]he standard form of agreement between owner and architect, AIA B141, states that the terms of the AIA Document A201 General Conditions are incorporated within the agreement between the Church and the architect." Yet the Church denied that "AIA Document A201 General Conditions were incorporated into the contract documents between [the Church] and any of the contractors performing work to build the Church." Thus, the Church's position on appeal is not necessarily inconsistent with its admissions.

This section incorporates the insurance requirement of AIA Document A201 into the Owner/Architect Agreement with respect to the waiver of subrogation between the owner and architect. It does not incorporate the entire form into the Agreement.

Finally, Ferrellgas' position is inconsistent with the other provisions of the Owner/Architect Agreement. If AIA Document A201 in its entirety were incorporated by reference into the Agreement, then there would be no reason for the architect to assist the owner in the preparation of the "Conditions of the Contract, and the form of Agreement between the Owner and Contractor." Because the waiver of subrogation contained in AIA Document A201 is not incorporated by reference into the Owner/Architect Agreement, the trial court did not err in granting the Church's motion for summary judgment as to this defense.

D. Is Ferrellgas a co-insured under the Church's property insurance policy?

 Ferrellgas also argues that it is a co-insured under the Church's insurance policy because the policy "shows a clear intent . . . to cover the church building under construction, as well as the property of others that comes within the policy definition of the covered building."[6] The Church acknowledges the general principle that an insurer cannot subrogate against a co-insured. *See Johnny's Seafood Co. v. City of Tacoma*, 73 Wn. App. 415, 422, 869 P.2d 1097 (1994). However, the Church rejects the argument that Ferrellgas is a co-insured under the policy. We agree that Ferrellgas is an indirect beneficiary under the policy but disagree that this insulates them from liability for their negligence for loss to the entire building in a subrogation claim brought by the property insurer.

Washington courts have recognized that "[t]he term 'co[-]insured' does not necessarily apply only to named insureds, but may also apply to all for whose benefit the insurance

---

[6] Art & Sons makes a similar argument, but we need not address it given our resolution of the first issue.

was written." *Id.* at 422-23 (citing *General Ins. Co. of Am. v. Stoddard Wendle Ford Motors*, 67 Wn.2d 973, 979, 410 P.2d 904 (1966)). Therefore, the first question is whether the insurance policy provides coverage for Ferrellgas' tanks.

We review the interpretation of an insurance policy de novo. *See Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989). When analyzing an insurance policy, we look at the language the way it would be read by the average insurance purchaser. *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997). The policy is given a fair, reasonable, and sensible construction. *Tyrrell v. Farmers Ins. Co.*, 140 Wn.2d 129, 133, 994 P.2d 833 (2000). We enforce an unambiguous policy as it is written. *Pemco Mut. Ins. Co. v. Utterback*, 91 Wn. App. 764, 767, 960 P.2d 453 (1998), *review denied*, 137 Wn.2d 1009, 978 P.2d 1097 (1999).

Here, the Church's policy is unambiguous. It covered the "Building," which includes "[p]ermanently installed fixtures, machinery and equipment." The policy also covered "Buildings in course of construction" and "[i]f not covered by other protection . . . [m]aterials, equipment, supplies and temporary structures, on the described premises, used for making additions, alterations or repairs to the building or structure." It is undisputed that Ferrellgas' tanks were not covered by other insurance. We, therefore, conclude that Ferrellgas' tanks were covered under these provisions and Ferrellgas was at least an indirect beneficiary of the Church's policy.

E. Does its "co-insured" status insulate Ferrellgas from liability for the entire project?

Ferrellgas argues that, because it is a "co-insured" under the Church's policy, the insurance company has no subrogation rights against it for its possible negligence in starting the fire. Ferrellgas relies primarily on three builder's risk cases: *Transamerica Ins. Co. v. Gage Plumbing & Heating Co.*, 433 F.2d 1051 (10th Cir. 1970); *J.F. Shea Co. v. Hynds Plumbing & Heating Co.*, 96 Nev. 862, 619 P.2d 1207 (1980), *overruled on other grounds by, Lumbermen's Under-*

*writing Alliance v. RCR Plumbing, Inc.*, 114 Nev. 1231, 969 P.2d 301 (1998); and *United States Fire Ins. Co. v. Beach*, 275 So. 2d 473 (La. Ct. App. 1973).

In *Stoddard Wendle*, our Supreme Court noted that subrogation cases against co-insureds are rare and occur mostly in the field of builder's risk insurance. *Stoddard Wendle*, 67 Wn.2d at 979. The court also said, "courts have consistently held, in the builder's risk cases, that the insurance company—having paid a loss to one insured—cannot, as subrogee, recover from another of the parties for whose benefit the insurance was written even though his negligence may have occasioned the loss." *Id.* (citations omitted).

Although the general statement is accurate, courts are split on the extent to which "co-insured" status insulates a negligent contractor or subcontractor from liability. *See generally* Jay M. Zitter, Annotation, *Insurance: Subrogation of Insurer Compensating Owner or Contractor for Loss Under "Builder's Risk" Policy Against Allegedly Negligent Contractor or Subcontractor*, 22 A.L.R. 4TH 701 (1983). Some courts hold that a builder's risk insurer has no subrogation rights against a negligent contractor who is a co-insured on the policy. *See, e.g., Dyson & Co. v. Flood Eng'rs, Architects, Planners, Inc.*, 523 So. 2d 756 (Fla. Dist. Ct. App. 1988); ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 3.10(a)(1) (1988); *Baugh-Belarde Constr. Co. v. College Utils. Corp.*, 561 P.2d 1211 (Alaska 1977); *Gage Plumbing & Heating Co.*, 433 F.2d at 1055. The anti-subrogation rule has been applied, even though the contractor is not named in the policy but is a co-insured based on loss, to the builder's machinery, tools, equipment, or similar property for which the insured is liable. *See Gage Plumbing & Heating Co.*, 433 F.2d at 1053; *J.F. Shea*, 619 P.2d at 1209-10 & n.4; *Beach*, 275 So. 2d at 473-75.

But other courts have concluded that builder's risk insurance extends to a subcontractor only for damage done to his

property and does not provide subcontractor immunity from liability for damage to other covered property.[7]

We reject the blanket rule that co-insured status for any loss under a builder's risk policy automatically insulates the co-insured from subrogation by the insurer for damage to all property covered therein. Instead, the first question is whether the owner and the contractor agreed that the owner would purchase insurance to cover damage to the project caused by the contractor's negligence. *See Public Employees Mut. Ins. Co. v. Sellen Constr. Co.*, 48 Wn. App. 792, 793, 740 P.2d 913 (1987).

As one court explained:

> It is not an uncommon practice in construction contracts for the owner to agree to purchase insurance to protect the interests of some or all of the contractors, subcontractors, and materialmen. An agreement to insure is an agreement to provide both parties with the benefits of insurance regardless of the cause of the loss (excepting wanton and willful acts). *An agreement to insure differs from an agreement to indemnify* in that, with an agreement to insure, the risk of loss is not intended to be shifted to one of the parties, but is instead intended to be shifted to an insurance company. Neither party intends to assume a potential liability because both are demonstrating appropriate business foresight in avoiding liability by allocating it to an insurer.
>
> In an arrangement where one party agrees to purchase insurance for the benefit of both parties, the first party in effect agrees to waive the intended insured's liability. Thus, the party who agreed to purchase insurance has no cause of action against the party for whose benefit the insurance was intended regardless of the fault of this intended insured. And, as the rights of a subrogated insurer can rise no higher than the rights of its insured, the first party's insurance carrier has no subrogation cause of action against the intended insured.

[7] *See Turner Constr. Co. v. John B. Kelly Co.*, 442 F. Supp. 551 (E.D. Pa. 1976); *Public Serv. Co. v. Black & Veatch Consulting Eng'rs*, 328 F. Supp. 14 (N.D. Okla. 1971); *Paul Tishman Co. v. Carney & Del Guidice, Inc.*, 36 A.D.2d 273, 320 N.Y.S.2d 396 (1971); *Willis Realty Assocs. v. Cimino Constr. Co.*, 623 A.2d 1287 (Me. 1993); *McBroome-Bennett Plumbing, Inc. v. Villa France, Inc.*, 515 S.W.2d 32 (Tex. Civ. App. 1974); *Employers' Fire Ins. Co. v. Behunin*, 275 F. Supp. 399 (D. Colo. 1967); *see also Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907 (10th Cir. 1986).

*Indiana Erectors, Inc. v. Trustees of Ind. Univ.*, 686 N.E.2d 878, 880-81 (Ind. Ct. App. 1997) (citations omitted) (emphasis added).

In Washington, the *Sellen* case, 48 Wn. App. 792, demonstrates that the extent to which a co-insured contractor is insulated from a subrogation action for damage to the project depends on the intent of the owner and contractor to allocate the risk of loss for the project to the owner's insurer. In *Sellen*, a building owner hired a contractor to remodel an existing building. The contractor allegedly damaged some microfiche records during construction, and the owner's insurer brought a subrogation claim against the contractor. *Id.* at 792-93. The contractor was named as an additional insured on the owner's policy, but only with respect to some of its property located in the building. *Id.* at 793.

By contract, the owner and contractor agreed that the owner would purchase insurance on the "entire Work at the site." *Id.* The contractor agreed to purchase insurance to protect against "claims for damages, other than to the Work itself." *Id.* at 794. The court concluded that, because the owner was required to purchase insurance to cover the work, the contractor was constructively co-insured and could not be sued for any damage to the work. But the court also held that the parties must have intended that the contractor not be included as a co-insured on the owner's policy to the extent of any damage to the non-work property. *Id.* at 796. Thus, the outcome of the subrogation action turned on whether the microfiche records were included within the term "work." *Id.* And, unless the parties intended that the microfiche records were included in the work, the contractor was not constructively co-insured with respect to its damage to the records. *Sellen*, 48 Wn. App. at 797.

*Stoddard Wendle*, 67 Wn.2d 973, also demonstrates that the question of whether a negligent party is insulated from liability for damage to insured property turns on the intent of the named insured to provide insurance to protect the

negligent party from loss or damage to the property. In *Stoddard Wendle,* a Ford dealer sold a customized logging truck to the purchaser under a conditional sales contract. The vendor's interest in the sales contract was assigned to a finance corporation and later reassigned to the Ford dealer. The contract required the purchaser to carry insurance on the truck, and the insurance policy named the finance corporation as loss payee. Other than a down payment, the purchaser made no payments on the truck. After the truck was damaged as a result of its negligent work, the dealer repossessed it. The insurance company paid for the repairs and the dealer paid the deductible. *Stoddard Wendle,* 67 Wn.2d at 974-75.

The Supreme Court concluded that the insurance was intended for the dealer's benefit because the insurance was required by the dealer's contract and the dealer received the benefit of the insurance based on repairs to the truck in its possession. *Stoddard Wendle,* 67 Wn.2d at 977-78. The court also concluded that the finance company was merely an agent for the dealer and that the insurance company recognized the dealer's interest when it sent notice of cancellation listing it as an additional insured. *Stoddard Wendle,* 67 Wn.2d at 978-79. Because the dealer was an intended beneficiary of the policy, the insurance company could not subrogate against the dealer for its negligence. *Stoddard Wendle,* 67 Wn.2d at 979.

Here, Ferrellgas has presented no evidence that the Church intended to purchase builder's risk insurance on its behalf and thereby insulate Ferrellgas from liability for its negligence with respect to the building. At most, the evidence shows that Ferrellgas intended, through its invoices, to shift the risk of loss for the tanks to the Church. If we assume that the Church is liable for the loss of the tanks, there is still no requirement that the Church purchase insurance to cover the risk of loss. And, although Ferrellgas is an indirect beneficiary of the insurance, it was not an intended beneficiary of the insurance so as to immunize it

from its negligence for damage to the building under construction.

■■■ Subrogation is an equitable doctrine that allows the insurer to recover from the negligent third party the amount that it has paid to its insured. *See Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 341, 831 P.2d 724 (1992). It is generally stated that the insurer steps "into the shoes" of its insured. *Touchet Valley*, 119 Wn.2d at 341 (quoting ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 3.10(a)(1) (1988)); *accord Johnny's Seafood Co.*, 73 Wn. App. at 422. The insurer has "rights equal to, but no greater than, those of the injured party." *Touchet*, 119 Wn.2d at 341; *Millican of Wash., Inc. v. Wienker Carpet Serv., Inc.*, 44 Wn. App. 409, 414, 722 P.2d 861 (1986); *Johnny's Seafood*, 73 Wn. App. at 422. Because the Church did not agree to provide insurance to protect Ferrellgas, the Church could sue Ferrellgas for its negligence in causing the fire. And, because it steps "into the shoes" of the insured, the insurer may maintain a subrogation action.

## CONCLUSION

In conclusion, we affirm the summary judgment in favor of Art & Sons based on the waiver of subrogation in AIA Document A207. The Church concedes, and we agree, that Art & Sons is entitled to attorney fees on appeal under the prevailing party clause in the Trade Contract. We also affirm summary judgment for the Church with respect to the dismissal of Ferrellgas' affirmative defenses.

BRIDGEWATER and HUNT, JJ., concur.

Reconsideration denied October 10, 2000.

Review denied at 143 Wn.2d 1003 (2001).