818

[No. 78866-9.    En Banc.]
Argued September 14, 2006.    Decided October 16, 2008.

JACK M. NAVLET ET AL., *Individually and on Behalf of a Class of Others Similarly Situated, Appellants*, v. THE PORT OF SEATTLE, *Respondent*.

820

*James D. Oswald* (of *Law Offices of James D. Oswald*), for appellants.

*Richard J. Birmingham* (of *Davis Wright Tremaine LLP*), for respondent.

¶1 OWENS, J. — This case requires the determination of whether retirement health care and welfare benefits (welfare benefits) provided in a collective bargaining agreement vested for life with employees who reached retirement eligibility during the term of the agreement. The appellants are nine current or retired employees (Appellants) of the Port of Seattle (Port), who were eligible to receive retirement welfare benefits pursuant to a collective bargaining agreement (CBA) between the Port and the International Longshore and Warehouse Union Local 9 (Local 9). After the CBA expired, the Port ceased contributing to the welfare trust fund (Welfare Trust), which administered the welfare benefits provided for eligible employees and retirees. Upon ceasing contributions, the trustees terminated the Welfare Trust's coverage for all employees and retirees, including Appellants. The Port offered Appellants the opportunity to participate in the Port's own employee benefits plan but did not offer to pay the premiums for such coverage.

¶2 We hold that state law governs the vesting principles for retirement welfare benefits conferred through a CBA with a state employer and therefore decline to interpret such rights under Title I of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. Applying the applicable vesting principles to the CBA, we further hold that the Port is obligated to provide retirement welfare benefits for life to Appellants who have satisfied the eligibility requirements to receive such benefits. Accordingly, we reverse the trial court's summary judgment order, enter partial summary judgment in favor of Appellants, and remand for further proceedings.

## FACTS

¶3 In 1997, the Port and Local 9 entered into the CBA, which superseded the parties' previous CBAs covering the terms and conditions of employment. Clerk's Papers (CP) at 41-61. Under section XVIII of the CBA, the Port promised to "maintain the current level of medical, welfare, dental and related benefits during the duration of this contract and . . . continue to provide the same level of coverage currently provided to eligible employees, eligible retirees, and dependents." CP at 52.[1]

¶4 The Port further agreed in section XVIII "to be party to the Agreement and Declaration of Trust of the ILWU Local 9 Warehouse Welfare Trust Fund" (Welfare Trust Agreement or Trust Agreement) that would govern the terms of the Welfare Trust. CP at 52, 86-123. The Welfare Trust was created to receive contributions from participating employers in order to administer a welfare benefits plan for participating employees. CP at 91. The Welfare Trust Agreement stated that the terms of the CBA determined the employer's obligation to make contributions to the Welfare Trust. CP at 92. In section XVIII of the CBA, the Port agreed "to pay the premium necessary to maintain the current level of benefits to that Trust." CP at 52. The Port was the principal participating employer making contributions to the Welfare Trust for several years prior to the termination of the CBA. CP at 288.[2]

¶5 The Trust Agreement further provided that the parties intended to organize and operate the Welfare Trust pursuant to the provisions of ERISA as well as other applicable federal and state laws. CP at 91. The Port and Local 9 each appointed three trustees to administer the Welfare Trust, and the Trust Agreement established proce-

---

[1] Although originally scheduled to expire in 2000, the parties extended the CBA to June 30, 2002.

[2] As discussed below, Local 9 made contributions to the Welfare Trust for its secretary treasurer who participated in the trust. CP at 287-90.

dures for participants to challenge a denial of benefits. The Trust Agreement stated that it would continue indefinitely but would "automatically terminate[ ] upon the expiration of all collective bargaining agreements and special agreements requiring the payment of contributions to the Trust Fund." CP at 91, 119.

¶6 In addition, the Welfare Trust Agreement defined an "employee welfare benefit plan" as "any lawful employee pension benefit plan created and administered by the Trustees." CP at 92. The parties signed a Warehousemen's Pension Trust Fund Industry Pension Agreement (Pension Agreement), which they incorporated by reference into the CBA, obligating the Port to make contributions for an employee pension trust fund. CP at 299-300. The Welfare Trust Agreement conditioned retiree eligibility for retirement welfare benefits on the eligibility requirements for the Pension Agreement. The Pension Agreement specifically provided eligibility requirements for pension as well as retirement welfare benefits: "[A]n employee who elects to retire before age 62 . . . shall not be entitled to retiree health and welfare benefits until such retiree reaches age 62. At that time, benefits will be provided under the terms and conditions that are in effect at the time of entitlement." CP at 300.

¶7 Local 9 provided participant-employees with a copy of a summary plan description (SPD), which described the terms of the welfare benefits plan that would be administered by the Welfare Trust. CP at 125-68.[3] As with the Trust Agreement itself, the SPD contained a section purportedly explaining the participants' rights under ERISA. The SPD also contained a provision purporting to reserve the Welfare Trust trustees' right to terminate the trust:

---

[3] The SPD stated that employees were eligible for retiree benefits as early as age 62 if they met the years of service requirement. CP at 134. For example, an employee with 15 years of service was eligible for benefits at a maximum monthly cost of $20.35 per employee beginning when the participant reached age 62.

**The Retired Employee Program is not Guaranteed**

The Board of Trustees is providing retiree health and welfare benefits to the extent that monies are currently available to pay the cost of such programs. The Board of Trustees retains sole and exclusive authority, at its discretion, to determine the extent, if any, to which monies are available for this program and to determine the manner of expenditure of such monies for the program. The program is not guaranteed to continue indefinitely. The Board of Trustees reserves the right to change the eligibility rules of the benefits, reduce the benefits, or eliminate the Plan entirely, as may be required by future circumstances.

CP at 166.

¶8 On March 3, 2003, the Port informed the trustees that it would immediately "cease paying for retiree Health and Welfare benefits."[4] CP at 68. On April 1, 2003, the trustees then informed participants that retiree welfare benefit coverage would cease as of April 30, 2003. The Port advised participants they could obtain continued welfare coverage through the Port's own plan at a monthly cost ranging from $399.08 to $482.12 for an individual retiree not yet covered by Medicare.

¶9 Appellants filed a complaint against the Port, claiming a right to lifetime retirement welfare benefits under the terms of the CBA. Appellants fall into two categories: (1) those who have retired, have satisfied the length of service requirements for eligibility, and have been covered by the Welfare Trust and (2) those who have not yet retired but have completed sufficient length of service to qualify for retirement welfare benefits.

---

[4] Between October 2002 and April 2003, Local 9 filed several unfair labor practice charges against the Port, alleging that the Port improperly made unilateral changes to the terms of employment. The Welfare Trust trustees initiated arbitration concerning the Port's obligations to Local 9's members. The Port and Local 9 reached a settlement in which Local 9 agreed to adopt resolutions, stating "that the Port of Seattle owes no contribution(s) to the I.L.W.U. Local 9 Welfare Trust Fund relating to any maintenance of benefits thereunder." CP at 77. However, the Port did not terminate the pension plan and agreed to fund the pension plan "to the extent necessary . . . to pay the vested accrued benefits of participants." CP at 78.

¶10 On August 8, 2005, the trial court granted summary judgment in favor of the Port, determining that the CBA did not expressly grant Appellants with retirement welfare benefits for life:

> [T]he Plaintiff's [sic] have no statutory basis for their claims to medical benefits. Nor do the unambiguous terms of the [SPD], or union contracts at issue in this case give rise to a contractual claim to the benefits sought by the plaintiffs. The fact that the plaintiffs may have become vested in their benefits does not change the nature and duration of the benefits, which are set forth and limited in the [SPD].

CP at 479-80. Appellants sought review by the Court of Appeals. Division One certified this case for review by this court pursuant to RCW 2.06.030. This court's commissioner accepted certification and transferred the entire case to this court for determination on the merits. RAP 4.4.

## ANALYSIS

### I

¶11 We review summary judgment de novo, engaging in the same inquiry as the trial court. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

### II

¶12 This case requires us to determine the extent to which the CBA obligated the Port to provide retirement welfare benefits to eligible retirees. The parties agree that the CBA created a right to retirement welfare benefits for certain eligible retirees. However, the parties disagree whether the CBA created a vested right in welfare benefits or whether the right expired at the termination of the

CBA.[5] The Port contends that the right to retirement welfare benefits was not expressly guaranteed for any definite period of time in the CBA or the Welfare Trust Agreement, and therefore the Port had no obligation to make contributions for such benefits beyond the duration of the CBA itself. In addition, the Port argues that its obligation under the CBA was limited to making contributions to the Welfare Trust and that the Welfare Trust Agreement and the SPD defined the extent to which the benefits would be provided. Conversely, Appellants urge that the welfare benefits promised in the CBA constituted deferred compensation for years of continued service to the Port and therefore they could not lose such benefits once they became eligible.

¶13 While federal law generally preempts the field of labor law, it does not govern over collective bargaining agreements with state public employers. *See* 29 U.S.C. § 152(2); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181, 127 S. Ct. 2372, 168 L. Ed. 2d 71 (2007) ("The National Labor Relations Act [(NLRA)] leaves States free to regulate their labor relationships with their public employees."). In Washington, the Public Employees' Collective Bargaining Act (PECBA), chapter 41.56 RCW, governs collective bargaining agreements with state public employers. *See Peninsula Sch. Dist. No. 401 v. Pub. Sch. Employees*, 130 Wn.2d 401, 407, 924 P.2d 13 (1996).[6] However, we may look to the interpretation of federal labor law where the law is similar to state law. *Allen v. Seattle Police Officers' Guild*, 100

---

[5] Generally, a "vested right" cannot be taken away once created. In the employment context, an employee who renders service in exchange for compensation has a vested right to receive such compensation. *Leonard v. City of Seattle*, 81 Wn.2d 479, 487, 503 P.2d 741 (1972). Upon vesting, such a right becomes a proprietary interest, even though created by contract. *Id.* at 486. A right to deferred compensation vests at the time it is created, although the right to payment does not accrue until a condition has been fulfilled in the future. *Id.*

[6] The PECBA applies to "any political subdivision of the state of Washington," RCW 41.56.020, including port districts, RCW 53.18.015 ("Port districts and their employees shall be covered by the provisions of chapter 41.56 RCW except as provided otherwise in this chapter."). *See Ryder v. Port of Seattle*, 50 Wn. App. 144, 149, 748 P.2d 243 (1987).

Wn.2d 361, 372, 670 P.2d 246 (1983) ("[W]here Washington's Public Employees Collective Bargaining Act is substantially similar to the NLRA, decisions under that act, while not controlling, are persuasive."). As a general principle, rights that vest in a collective bargaining agreement survive the term of the agreement. *Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 207, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991) ("Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement."); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Defiance Indus., Inc.*, 251 F. Supp. 650, 653-54 (N.D. Ohio 1966); *Rose City Transit Co. v. City of Portland*, 18 Or. App. 369, 414-15, 525 P.2d 1325 (1974) ("[R]ights once vested may not be lost by the employe[e] when his collective bargaining agreement expires."), *aff'd as modified*, 271 Or. 588, 533 P.2d 339 (1975). Therefore, the vested nature of the retirement welfare benefits conferred in the CBA is the critical issue of the case.

¶14 Our determination of whether the retirement welfare benefits vested largely turns on what legal principles govern the vesting of retirement benefits conferred through collective bargaining. Although the CBA itself is governed by state law, the Port urges us to apply vesting principles consistent with ERISA in construing the rights conferred in the CBA. On the other hand, the Appellants contend that federal law is inapplicable and that vesting principles under our state employment law must apply. This court has construed retirement benefits conferred through collective bargaining as compensatory and therefore vested at the time they are created.

### A

¶15 Congress enacted ERISA to provide comprehensive and uniform federal regulation for employee benefits plans. 29 U.S.C. § 1001; *see generally* Andrew M. Campbell, Annotation, *Construction and Application of Employee Retirement*

*Income Security Act of 1974 (29 U.S.C.A. §§ 1001 et seq.) by United States Supreme Court*, 150 A.L.R. Fed. 441, 455 (1998). The Port seeks to apply federal law because retirement welfare benefit plans specifically do not vest under ERISA absent a clear expression of the employer's intent. This "clear intent" requirement derives from ERISA's distinction between pension and welfare benefits. ERISA requires automatic vesting of pension benefits, but not welfare benefits. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 137-38 (3d Cir. 1999) ("Although ERISA contains elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans."). Federal courts have seized on this statutory distinction to apply a strict inference against vesting for welfare benefit plans. *See id.* at 139 (" 'Courts may not casually infer the existence of vesting; doing so would undercut Congress' considered decision that, while pension benefits are strictly regulated and guaranteed, welfare benefits have no such protection.' " (quoting *Sengpiel v. B.F. Goodrich Co.*, 970 F. Supp. 1322, 1337 (N.D. Ohio 1997), *aff'd*, 156 F.3d 660 (6th Cir. 1998))).[7] Furthermore, ERISA requires welfare benefit plans to be governed by the express language of written benefit plan documents. 29 U.S.C. § 1102. The courts additionally have

---

[7] *See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 901 (3d Cir. 1995) ("In rejecting the automatic vesting of welfare plans, Congress evidenced its recognition of the need for flexibility with regard to an employer's right to change medical plans."); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) ("Because such an obligation constitutes an extra-ERISA commitment, however, courts may not lightly infer the existence of an agreement to vest employee welfare benefits."); *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990) ("[W]e must avoid any rule that would have the effect of undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement."); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir. 1990) (" '[T]o require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.' " (quoting H.R. Rep. No. 93-807, at 60 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4726)); *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988) (same); *Poole v. City of Waterbury*, 266 Conn. 68, 84, 831 A.2d 211 (2003) ("The courts imposing a presumption *against* vesting base that approach largely on their construction of ERISA— drawing an adverse inference from Congress' decision to require vesting for *pension* rights, but not to include a comparable requirement for welfare benefits.").

recognized this express language requirement as grounds for applying the inference against vesting absent a clear expression of the employer's intent. *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) ("*[I]n recognition of ERISA's requirement* that employee benefit plans be governed by written plan documents filed with the Secretary of Labor, any participant's right to a fixed level of lifetime benefits must be 'found in the plan documents and must be stated in clear and express language.' " (emphasis added) (citations omitted) (quoting *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir. 1993))).[8] The Port would have the benefit of such an inference if ERISA's vesting rules apply to the welfare benefits conferred in the CBA.

¶16 ERISA generally preempts state law relating to employee benefit plans. 29 U.S.C. § 1144(a). However, ERISA does not apply to "a governmental plan," 29 U.S.C. § 1003(b)(1), meaning "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing," 29 U.S.C. § 1002(32). A "governmental plan" includes a plan established pursuant to a collective bargaining agreement and jointly maintained by an employer and union representatives so long as the governmental entity exclusively funds

---

[8] *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) ("[T]he intent to vest 'must be found in the plan documents and must be stated in clear and express language.' " (quoting *Wise*, 986 F.2d at 937)); *Unisys Corp.*, 58 F.3d at 902 ("ERISA's framework ensures that employee benefit plans be governed by written documents and [SPDs], which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits. Accordingly, any retiree's right to lifetime medical benefits under a plan can only be found if it is established by the terms of the ERISA-governed employee benefit plan." (citations omitted)); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990) ("[A]ny retiree's right to lifetime medical benefits at a particular cost can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document."); *Moore*, 856 F.2d at 492 ("Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans."); Catherine L. Fisk, Lochner *Redux: The Renaissance of Laissez-Faire Contract in the Federal Common Law of Employee Benefits*, 56 OHIO ST. L.J. 153, 173 (1995) ("[C]ourts infer not only that ERISA does not require vesting, but that . . . in the absence of some explicit written agreement, ERISA directs courts to presume that welfare benefits do not vest.").

the plan. *See, e.g., Gualandi v. Adams*, 385 F.3d 236, 243-44 (2d Cir. 2004) ("[E]xclusive governmental funding is enough to constitute governmental establishment of a plan."); *Feinstein v. Lewis*, 477 F. Supp. 1256, 1262 (S.D.N.Y. 1979) ("[I]t is apparent that Congress intended through [29 U.S.C. § 1003(b)(1)] to exclude public employees from coverage."), *aff'd*, 622 F.2d 573 (2d Cir. 1980).

¶17 The parties do not dispute whether the Port is a state government entity. Instead, the Port maintains that it did not exclusively maintain the Welfare Trust because private employers had made contributions to the trust in previous years. However, the status of a plan is determined by the entity that currently maintains the plan. *See Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 920 (2d Cir. 1987). Therefore, the Welfare Trust became a governmental plan when the Port began exclusively funding the trust.

¶18 The Port further argues that it did not exclusively maintain the Welfare Trust because Local 9 made contributions to the trust for its secretary treasurer, who was the only non-Port employee to participate in the trust's plan. The participation in a plan by a "de minimis" number of nongovernmental employees does not defeat a plan's status as a governmental plan.[9] Dep't of Labor, Employee Benefits Sec. Admin., Op. 2005-21 A, 2005 ERISA LEXIS 23, at *7 (Dec. 21, 2005), Op. 2005-17 A, 2005 ERISA LEXIS 18, at *4 (June 22, 2005); Dep't of Labor, Pension & Welfare Benefit Programs, Op. 2002-11 A, 2002 ERISA LEXIS 4, at *5 (Oct. 17, 2002); *see also Nowell v. Cent. Serv. Ass'n*, 106 F. Supp. 2d 888, 891-92 (S.D. Miss. 2000). Therefore, the

---

[9] The Port claims that the governmental plan exemption is inapplicable because Appellants "can not establish that all or substantially all the participants who are or may be entitled to retiree medical benefits under the Trust are governmental employees." Suppl. Br. of Resp't at 12. This claim is unfounded. Attached to Appellants' cross motion for summary judgment is an affidavit from Tony Hutter, the secretary treasurer of Local 9. CP at 287-90. Hutter attested that "[t]o my knowledge, since the mid-1990's, no contributions have been made to the Welfare Plan other than the contributions by the Port of Seattle, and the contributions on my behalf by Local 9." CP at 288. The Port has offered no evidence to rebut Hutter's assertion. Thus, the Port's evidentiary argument is without merit.

Welfare Trust constituted a governmental plan within the meaning of 29 U.S.C. § 1002(32).

¶19 The Port goes on to argue that even if the Welfare Trust is a governmental plan, we should nevertheless determine the applicability of ERISA by examining the intent of the parties. The Port concedes that the parties cannot contractually confer ERISA jurisdiction on a governmental plan. Resp't's Answering Br. at 9; *see, e.g., Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995) (quoting *Roy v. Teachers Ins. & Annuity Ass'n*, 878 F.2d 47, 49 (2d Cir. 1989)). However, the Port contends that the Welfare Trust Agreement expressed the parties' intent to have the Welfare Trust interpreted in accordance with ERISA. Specifically, the Port points out that the Trust Agreement stated that the parties intended to organize and operate the trust "pursuant to the provisions of [ERISA], the Internal Revenue Code, as applicable, and the Labor-Management Relations Act of 1947, as applicable, as well as any other applicable federal or state laws." CP at 91.

¶20 This language indicates the parties' intent to interpret the operation and organization of the Welfare Trust, not how to interpret the rights created under the CBA. As discussed below, the underlying obligation to provide welfare benefits derives from the CBA, not the Welfare Trust. The interpretation of the Trust Agreement does not determine the vested nature of the benefits conferred in the CBA.

¶21 In any event, the Welfare Trust Agreement language itself does not establish that the parties intended to restrict our interpretation of the Welfare Trust exclusively under ERISA. The language expressly includes the intent to organize and operate the Welfare Trust under ERISA "as well as any other applicable federal or state laws." *Id.* State law would apply here because the Welfare Trust is expressly exempted from coverage under ERISA, and nothing in the Trust Agreement indicates that the parties intended to prevent us from applying state law in the absence of ERISA jurisdiction. Tellingly, the parties significantly deviated from ERISA's own requirements in

the Welfare Trust Agreement, indicating their intent that ERISA would not exclusively control the interpretation of the Welfare Trust. For example, the Trust Agreement defines an "employee welfare benefit plan" as "any lawful employee *pension* benefit plan created and administered by the Trustees." CP at 92 (emphasis added). As discussed above, ERISA defines "welfare benefits" separately from "pension benefits" and applies different vesting requirements for each type of benefit. 29 U.S.C. § 1002(1), (2)(A). Here, the parties rejected application of ERISA's distinction between pension and retirement welfare benefits by defining a welfare benefits plan as concomitant with a pension benefits plan.

¶22 We hold that ERISA does not govern our determination of whether the retirement welfare benefits were vested. As the benefits were created under the CBA, which is governed as a matter of state law, we look to applicable state law to determine the vested nature of the welfare benefits at issue in this case.

## B

¶23 This court has a long history of protecting an employee's vested right to retirement benefits, prior to and independent of any reliance on federal law. *See Crabtree v. Dep't of Ret. Sys.*, 101 Wn.2d 552, 556, 681 P.2d 245 (1984) ("[D]ecades before the federal government acted in this area [through ERISA], our courts recognized the importance of pension benefits and applied our own safeguards."). We have recognized that retirement benefits vest at the time they are created if they are properly considered compensatory. "Washington law is clear that the contractual obligation to fund a retirement system arises from the employment relationship when the employee's right to the retirement benefit exists at the outset of the employment relationship." *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 222, 45 P.3d 186, 50 P.3d 618 (2002). "[T]he duty . . . flows from the compensatory nature

of the [benefit conferred] in the employment relationship, and does not necessarily flow from the collective bargaining agreement." *Id.* at 221. The obligation arises independent of any required showing of the employer's express intent to provide retirement benefits.

¶24 In the seminal *Bakenhus* case, this court held that pension benefits conferred in an employment relationship constitute deferred compensation. *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 698, 296 P.2d 536 (1956). The right to such compensation vests at the moment that the employee accepts an offer to work in exchange for the promise of pension benefits. *Id.* at 700; *see Crabtree*, 101 Wn.2d at 557 (" 'the rights in and to it [the pension] commence to vest with the first day of employment or service, and continue to vest with each day's service thereafter' " (alteration in original) (quoting *Tembruell v. City of Seattle*, 64 Wn.2d 503, 506, 392 P.2d 453 (1964))). While the *Bakenhus* court admitted that applying contract theory to secure a vested right in pension benefits "may not be flawless in a purely legalistic sense," such a conclusion "gives effect to the reasonable expectations of the employee." 48 Wn.2d at 701. The court explained that "[t]he promise on which the employee relies is that which is made at the time he enters employment; and the obligation of the employer is based upon this promise." *Id.* at 700. Therefore, the court focused its analysis on the expectations of the employee at the time the retirement benefits are conferred, rather than the express language of the contract, to determine whether the benefits vested.

¶25 Later, in *Dorward v. ILWU-PMA Pension Plan*, 75 Wn.2d 478, 452 P.2d 258 (1969), this court applied the *Bakenhus* analysis to pensions specifically created through collective bargaining. The *Dorward* court examined the employment relationship and recognized that pension benefits are presumably deferred compensation because of the " 'give and take' " nature of collective bargaining through which pension benefits "become irrevocably merged with wage increases in the finished product of the collective

bargaining agreement." *Id*. at 483. Specifically, the court took judicial notice of the fact that the employee obtains a pension benefit in collective bargaining as compensation for lost "job mobility and possible wage increases." *Id*. The employee forgoes present wage value in exchange for a future benefit that will accrue after the employee has given up his or her potential to seek a better job or better wages. The employee's decision to continue to work for the employer after negotiating for pension benefits provides the consideration for the promise to pay the pension. *Id*. ("The consideration rendered for the promise in the pension contract of the employer to pay a pension is established when the employee is shown to have knowledge of the pension plan and continues his employment."). Therefore, the expectation of the employee at the beginning of the relationship determines the compensatory nature of the benefit because the promise of a pension induces the employee to complete his or her required services before he or she receives the benefit. *See Jacoby v. Grays Harbor Chair & Mfg. Co.*, 77 Wn.2d 911, 915, 468 P.2d 666 (1970) (recognizing the generally accepted rule in most jurisdictions that "[a] retirement pension is pay withheld to induce continued faithful service").

¶26 As with *Bakenhus*, the *Dorward* court rejected a strict interpretation of the contractual language of the agreement itself and recognized that the compensatory nature of the pension created a vested right once the employee continues working under the contract. The court went on to hold that the obligation "will arise in such instances even though the pensioner does not know the precise terms of the pension agreement." *Dorward*, 75 Wn.2d at 483. A year after *Dorward*, the court again applied the *Bakenhus* rule to include completely voluntary, employer-financed pension plans. *Jacoby*, 77 Wn.2d 911.

¶27 Most recently, in *Firefighters*, this court again focused on the compensatory nature of the benefits as defining the contractual obligation to provide a vested benefit. 146 Wn.2d at 219-23. As in *Dorward*, the *Firefighters* court

recognized that such a contractual obligation may arise even if not included as an express term of a collective bargaining agreement. *Id*. at 220-21; *Dorward*, 75 Wn.2d at 483. Importantly, the *Firefighters* court did not distinguish between pension benefits and other kinds of retirement benefits in determining the compensatory nature of the benefits. Indeed, the court's analysis focused on all benefits within the " 'total compensation package,' " for which the parties negotiated in the collective bargaining process. 146 Wn.2d at 222. The court concluded that the parties considered Social Security and Medicare contributions compensatory when negotiating the collective bargaining agreement. *Id*.[10]

¶28 Despite our holding in *Firefighters*, the Port argues that the *Bakenhus* line of cases applies only to pension benefits and should not extend to retirement welfare benefits. However, our precedent under *Bakenhus* and its progeny offers no distinction between pension and other compensatory retirement benefits similarly negotiated though collective bargaining.

¶29 Collective bargaining creates a relationship through which the employee who negotiates for retirement benefits forgoes the full present value of his or her service with the expectation of receiving that value after he or she completes the service. *Dorward*, 75 Wn.2d at 483. If pension benefits

---

[10] The dissent attempts to distinguish *Firefighters* by pointing out that the benefits in that case were limited to the duration of the collective bargaining agreement. The dissent then jumps to the conclusion that *"Firefighters* shows that other benefits can be limited to the terms of a collective bargaining agreement." Dissent at 869. However, in that case the duration of the benefits was limited because the union had specifically sought the employer's contributions only up to the expiration of the current collective bargaining agreement. *Firefighters*, 146 Wn.2d at 212. Furthermore, *Firefighters* recognized that retirement benefits vest if properly considered compensatory in the employment relationship, even if not included as term of the collective bargaining agreement. *Id*. at 221 ("[T]he duty to fund social security accounts flows from the compensatory nature of the social security contributions in the employment relationship, and does not necessarily flow from the collective bargaining agreement."). Indeed, the Social Security and Medicare benefits that we determined to be part of the total compensatory package were not included as a term of the collective bargaining agreement. The dissent's focus on the terms of the collective bargaining agreement therefore is misplaced.

irrevocably merge with negotiation for wage increases, *id.*, then the same would hold true for welfare benefits similarly negotiated as part of the total compensatory package. *See Firefighters*, 146 Wn.2d at 222; *Farver v. Dep't of Ret. Sys.*, 97 Wn.2d 344, 346, 644 P.2d 1149 (1982) ("Pension *and other retirement plans* are unique property rights . . . in the nature of deferred compensation. As such they are not mere expectancies but are vested rights possessed by employees." (emphasis added)); *see also Frank v. Day's, Inc.*, 13 Wn. App. 401, 404, 535 P.2d 479 (1975) ("In this jurisdiction, pensions *or retirement programs*, whether public, established by collective bargaining, or voluntarily employer-funded, constitute deferred compensation for services rendered." (emphasis added)); *Abels v. Snohomish County Pub. Util. Dist. No. 1*, 69 Wn. App. 542, 552, 849 P.2d 1258 (1993) ("It is the law of this State that an employee has a vested right in the pension *or retirement system* in effect when he becomes a qualified employee, or which becomes effective during his employment, and that system cannot be altered to his detriment without a corresponding benefit to him." (emphasis added)). Either type of retirement benefit presumably results from the negotiation of some present wage value in exchange for a future benefit obtained upon completion of the required term of service. As succinctly stated in *Jacoby*, " 'Clearly . . . an employer cannot offer a *retirement system* as an inducement to employment and . . . withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.' " 77 Wn.2d at 916 (emphasis added) (quoting *Cantor v. Berkshire Life Ins. Co.*, 171 Ohio St. 405, 410, 171 N.E.2d 518 (1960)). In addition, the Ninth Circuit Court of Appeals has reached the same conclusion that this court's treatment of pension benefits would apply to all employee benefits:

> We think that that same form of reasoning [that pension benefits are deferred compensation] *applies to all employee benefits.* Few of them are mere gratuities or a result of unadulterated altruism. Most are for services rendered or for

the purpose of inducing the further rendering of services. They help to guarantee a competent and happy labor force.

*Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1014 (9th Cir. 1997) (emphasis added) (applying *Bakenhus* to an employee stock purchase plan).[11]

¶30 In the reality of the employment relationship, welfare benefits make up part of the core compensatory benefits package offered in exchange for continued service. *See, e.g., Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 823, 16 P.3d 583 (2001) (recognizing employer-provided health care benefits as "core, nonfringe benefits" provided in consideration for services rendered for purposes of calculating lost *wages* in the workers' compensation statute); *see Thorning v. Hollister Sch. Dist.*, 11 Cal. App. 4th 1598, 1606-07, 15 Cal. Rptr. 2d 91 (1992) (holding that health and life insurance benefits were similar to pension benefits, served as an inducement for continued employment, were a factor in the decision whether to retire, and could not be unilaterally terminated); *McMinn v. City of Oklahoma City*, 1997 OK 154, 952 P.2d 517, 521-22 (holding that retirement benefits include pension, medical, and other benefits rather than pension benefits alone). Both welfare and pension retirement benefits can take the form of deferred compensation when negotiated through collective bargaining.

¶31 An employee has a legitimate expectation that retirement benefits vest when conferred as compensation through a CBA. Collective bargaining is a term of art, authorizing employees to negotiate their conditions of em-

---

[11] We reject the Port's argument that Washington law does not provide for vesting of welfare benefits under RCW 41.04.208, a statute governing local government retirees. RCW 41.04.208 applies only to "[d]isabled" and "[r]etired" employees—those employees satisfying the eligibility and years of service requirements under the "Washington law enforcement officers' and firefighters' retirement system plan 2 and the public employees' retirement system [(PERS)]." RCW 41.04.208(1)(a), (c). Appellants did not participate in PERS. Moreover, the aforementioned statute did not go into effect until January 1, 2003, and explicitly states that its provisions do not affect any health plan contained in a collective bargaining agreement in existence as of January 1, 2003. RCW 41.04.208(11). Thus, RCW 41.04.208 does not apply and the Port's reliance on RCW 41.04.208 is unavailing.

ployment through a single representative at the bargaining table with their employer. RCW 41.56.080; *see Wash. State Patrol Lieutenants Ass'n v. Sandberg*, 88 Wn. App. 652, 656, 946 P.2d 404 (1997). However, the union's duty of fair representation for each employee terminates once the employee retires. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 172, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971) ("retirees could not properly be joined with the active employees in the unit that the Union represents").[12] Furthermore, the PECBA limits collective bargaining agreements to a three-year term. RCW 41.56.070. Without vesting, an employee who retires during the course of any one collective bargaining agreement would lose his or her ability to protect any retirement benefit conferred in that agreement less than three years after receiving the benefit. Therefore, the current collective bargaining agreement offers the retiring employee the only opportunity to ensure that retirement benefits will survive the term of the agreement. An employee would reasonably expect that negotiated retirement benefits will continue beyond the current agreement because the employee has no real ability to negotiate for the continuation of such benefits after he or she retires.

¶32 The implications of the limitation on retiree representation in collective bargaining were examined in *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), which recognized the vested nature of retirement welfare benefits provided in collective bargaining agreements. *See also Keffer v. H.K. Porter Co.*, 872 F.2d 60, 64 (4th Cir. 1989); *United Steelworkers of Am. v. Connors Steel Co.*, 855 F.2d 1499, 1504-05 (11th Cir.

---

[12] In fact, a union would likely breach its duty to fairly represent its current members if it attempted to secure benefits for retirees out of the employer's resources that otherwise would be spent on compensation for the current employees. *See Pittsburgh Plate Glass Co.*, 404 U.S. at 173 ("[T]he risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits.").

1988).[13] Similar to this court's focus on the employment relationship, the *Yard-Man* court determined that "examination of the *context* in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended." 716 F.2d at 1482 (emphasis added); *cf. Firefighters*, 146 Wn.2d at 221 ("[T]he duty . . . flows from the compensatory nature of the [benefit conferred] in the employment relationship, and does not necessarily flow from the collective bargaining agreement."). The court noted that "the union owes no obligation to bargain for continued benefits for retirees," and therefore "it is unlikely that such benefits . . . would be left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1482. We find this reasoning persuasive and supportive of our determination that the *Bakenhus* vesting principle applies to retirement welfare benefits conferred through collective bargaining.

¶33 We hold that retirement welfare benefits conferred in a collective bargaining agreement constitute deferred compensation where the parties negotiate for such benefits as part of the total compensatory package. The compensatory nature of the benefits creates a vested right in the retirees who reached eligibility under the terms of the applicable CBA. Once vested, the right cannot be taken away and will survive the expiration of the agreement. *See Litton*, 501 U.S. at 207. This vesting principle applies to our interpretation and construction of the CBA.

III

¶34 Applying our vesting principle, we now must determine whether the Port fulfilled its obligation to provide retirement welfare benefits conferred in the CBA. The Port maintains that the CBA required it to contribute to the

---

[13] Notably, *Yard-Man* established an opposite conclusion from *Skinner* and other cases adopting an inference against vesting. Whereas those cases are based on ERISA's distinction between pension and welfare benefits, *Yard-Man* and its progeny more closely resemble our case law by focusing directly on the collective bargaining process as the foundation for the employee's expectation.

Welfare Trust only for the duration of the CBA itself. We apply contract law to the interpretation and construction of collective bargaining agreements created under the PECBA. *Barclay v. City of Spokane*, 83 Wn.2d 698, 700, 521 P.2d 937 (1974). The purpose of contract interpretation is to determine the intent of the parties. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). We search for intent though the objective manifest language of the contract itself. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005) ("[W]e attempt to determine the parties' intent by focusing on the objective manifestations of the agreement."). Contract construction involves the application of legal principles to determine the legal effect of contract terms. *Id.* at 502 n.9.

## A

¶35 The CBA does not express the parties' intent to alter the vesting of the retirement welfare benefits conferred in the CBA. The CBA created the obligation to provide retirement welfare benefits but does not express a durational limit on the Port's obligation to provide welfare benefits to eligible retirees. Under section XVIII of the CBA:

> The Port shall maintain the current level of medical, welfare, dental and related benefits during the duration of this contract and shall continue to provide the same level of coverage currently provided to eligible employees, eligible retirees, and dependents.

CP at 52. While the first clause creates a right to the current level of coverage for the duration of the CBA, the second clause provides only that the Port "shall continue to provide" the same level of coverage to eligible employees and eligible retirees. The phrase "shall continue to provide" is unmodified.

¶36 This phrase cannot simply relate back to the duration period of the first clause, as such an interpretation would render the second clause redundant. *See Wagner v.*

*Wagner*, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980) ("An interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective."). If the parties merely intended that the Port would continue to provide benefits to eligible employees and retirees "during the duration of this contract," then the second clause would have been incorporated into the first clause. For example, the combined language could read: "The Port shall maintain the current level of benefits *for eligible employees, eligible retirees, and dependents* during the duration of this contract." As the parties intentionally separated the "duration of this contract" language from the "continue to provide" language, we must give individual meaning to each temporal period. *See id.* (holding that the rule of interpretation giving effect to all provisions is "especially true when the writing is the product of a long period of negotiation with both parties having been represented by competent counsel").

¶37 The "continue to provide" language more directly relates to the eligibility requirement in the second clause. The obligation of the Port to continue to provide benefits for *eligible* employees and retirees limits the obligation to provide benefits so long as the employee or retiree is eligible to receive such benefits. An employee maintains eligibility to receive benefits as long as he or she continues employment with the Port. The Port would end its obligation to provide coverage for an employee when the employee loses eligibility explicitly by ending work for the Port or necessarily by negotiating a new collective bargaining agreement with the Port.[14] *See Litton*, 501 U.S. at 206 (noting that the unfixed terms and conditions of a collective bargaining agreement have no force beyond the expiration of the

---

[14] Collective bargaining requires the employer and employee representative to meet at reasonable times, negotiate, and execute a written agreement that covers certain terms of employment. RCW 41.56.030(4). While the obligations created in a CBA may cease at some point beyond the termination of the agreement, RCW 41.56.123, an employer must continue to bargain with the employees' certified representative beyond the term of any one CBA, RCW 41.56.100. Therefore, the negotiation of terms for a current CBA necessarily contemplates the perpetuation of such rights in future negotiations.

agreement "in order to protect the statutory right to bargain"). On the other hand, a retiree obtains eligibility at the time of his or her retirement and remains retired until death. The CBA offers no language indicating that a retiree loses eligibility at the expiration of the agreement, or at any other time. As vested rights cannot be altered once created, a retirees' eligibility for vested retirement benefits cannot be taken away. A retiree presumably loses such eligibility only upon his or her death. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 773 (6th Cir. 1999) ("[T]o what other date than the death of the retiree . . . could the word 'continue' apply?").

¶38 As discussed above, an employee reasonably would expect that retirement welfare benefits in effect at the time he or she becomes eligible will survive the expiration of the agreement, given that the employee has no right to negotiate for continued benefits once he or she retires. *See Pittsburgh Plate Glass Co.*, 404 U.S. at 172-73. Even a vested right only fully accrues once the recipient becomes eligible to receive the benefit. *See Leonard v. City of Seattle*, 81 Wn.2d 479, 486-87, 503 P.2d 741 (1972). If the obligation to provide the benefit extended only for the term of the agreement, then the entire retirement benefit would be limited to the brief period from which the employee became eligible until the expiration of the agreement. *Poole v. City of Waterbury*, 266 Conn. 68, 94-95, 831 A.2d 211 (2003) ("In the context of retiree benefits, a construction of the phrase 'shall continue' limited to the duration period set forth in the agreement often would render the benefit inconsequential, lasting months or weeks, as the plaintiffs no longer would be in a position to negotiate with the city over future benefits."). If the Port's obligation to provide retirement welfare benefits were limited to the duration of the CBA, then such a limit would effectively negate the compensatory nature of the deferred benefit altogether. As the parties originally negotiated a three-year agreement, the Port's total obligation to provide retirement welfare benefits

would have lasted less than three years. Such a benefit could hardly be considered compensation for an employee who must work 15 to 25 years just to reach eligibility. The *Bakenhus* vesting principle does not permit such a narrow interpretation of the benefits conferred in the CBA. *See Bakenhus*, 48 Wn.2d at 700 ("Unless the services are rendered in reliance on an offer, they are consideration for nothing, and any pension received thereafter can only be a gratuity.").

B

¶39 Beyond the terms of the CBA itself, the Port argues that the right to retirement welfare benefits conferred in the CBA could not have vested because the Welfare Trust Agreement and SPD specifically reserved the right to such benefits. Under section XVIII of the CBA, the Port agreed to be a party to the Welfare Trust Agreement and to pay the necessary premiums to the Welfare Trust in order to maintain the current level of benefits. CP at 52. The Welfare Trust Agreement provided that the trustees could terminate the Welfare Trust at any time, but in any event the Welfare Trust would terminate "upon the expiration of all collective bargaining agreements and special agreements." CP at 119. The SPD also contained language explaining that "[b]enefits under this Retired Employee Program are not guaranteed for any definite period of time and benefits will be provided only to the extent that sufficient funds are available in the Trust." CP at 134. The Port concludes that such language unambiguously indicates that welfare benefits were not guaranteed for life.[15]

---

[15] The dissent argues that the CBA should be interpreted as incorporating the Welfare Trust Agreement and SPD by reference. However, "[i]ncorporation by reference must be clear and unequivocal." *W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 494, 7 P.3d 861 (2000). While the parties expressly incorporated the Pension Agreement into the CBA, they did not express a similar intent with the Welfare Trust Agreement. In addition, the CBA does not even mention, much less incorporate, the terms of the SPD. While these documents are required components of an ERISA plan, *see* 29 U.S.C. § 1102, they do not hold the same weight as a matter of state contract interpretation.

¶40 On the other hand, in the SPD the trustees informed participants that they "fully intend[ed] to continue this Plan indefinitely," and that they reserved the right to terminate it only in order "[t]o guard against unforeseen circumstance." CP at 166. The Port's decision to stop making contributions to the Welfare Trust would not seem to be an unforeseen circumstance that would give rise to the trustees' stated purpose for reserving the right to terminate the trust. Furthermore, the SPD statement that the benefits would be provided only to the extent to which funds were available simply directs the focus back to terms of the CBA, under which the Port promised to continue to provide retirement welfare benefits. Moreover, as discussed above, the Trust Agreement defined "employee welfare benefit plan" as "any lawful employee pension benefit plan." CP at 92. The Pension Agreement also sets eligibility requirements for retirement welfare benefits. CP at 300. The definition of a welfare benefits plan as a pension benefits plan and the establishment of welfare benefits eligibility in the Pension Agreement strongly indicate the parties' intent to treat both welfare and pension benefits as part of the total compensation package. *Firefighters*, 146 Wn.2d at 222.

¶41 Apart from the internal inconsistencies with the reservation language, the Port's argument ultimately fails because it incorrectly assumes that the terms of the Trust Agreement and SPD could define the Port's underlying obligation to provide welfare benefits conferred in the CBA. The termination language in the Trust Agreement only defined the duration of the Welfare Trust, not the underlying contractual obligation to provide the benefits. *See id.* ("[T]he contractual obligation to fund a retirement system arises from the employment relationship."). The Trust Agreement stated its purpose as creating "an entity to which contributions from participating employers . . . can be paid." CP at 91. It expressly defined the CBA as the source of the Port's obligation to make such payments. CP at 92 (" 'Collective bargaining agreement'—a written agreement . . . by the terms of which the employer is obligated to

make contributions to the Trust Fund."). The Port agreed in the CBA to contribute to the Welfare Trust to the extent necessary to maintain the current level of benefits. Therefore, the terms of the CBA determined the extent of the Port's obligation to provide benefits, not the Welfare Trust Agreement. While the Trust Agreement granted the trustees the power to terminate the Welfare Trust, such discretion did not affect the Port's obligations arising under the CBA to provide welfare benefits.[16] The Trust Agreement could not limit the vested rights conferred in the CBA.

¶42 Our interpretation of the CBA does not imply that the Welfare Trust was an ineffective tool to deliver the Port's underlying obligations during its existence. We note that the Welfare Trust was structured to protect the interests and rights of plan participants by including an equal number of employer and union representatives on the board of trustees and creating an administrative procedure for challenging the denial of benefits. When the Port stopped contributing to the Welfare Trust, the trust could not continue to offer welfare benefits to eligible retirees. These eligible retirees still have the right to receive benefits even though they can no longer be provided through the Welfare Trust.[17]

---

[16] Likewise, the CBA limited the trustees' authority to establish eligibility requirements. While the Trust Agreement contained specific eligibility requirements, the Welfare Trust did not determine the employees' right to eligibility. The CBA obligated the Port to continue to provide the same coverage that was currently being provided to eligible retirees. CP at 52. Therefore, the CBA fixed eligibility to the requirements in effect at the time the CBA went into effect. The Pension Agreement also established requirements for retirement welfare benefits eligibility. CP at 300.

[17] Our conclusion disposes of the Port's justiciability claims as well. The Port argues that the Welfare Trust is the proper defendant in a suit for retirement welfare benefits, not the employer. *See Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1287 (9th Cir. 1990). The Port further argues that the Welfare Fund is an indispensable party to the present action. However, the *Bakenhus* principle establishes that the conferral of retirement benefits creates an implied contract directly between the employee and *employer*. Appellants do not complain about the administration of benefits under the Welfare Trust. The trustees' obligations presumably expired with termination of the Welfare Trust itself. Appellants assert a right to benefits that outlived the term of the Welfare Trust, a right that the Trust itself could not fulfill once the

¶43 Even assuming that the reservation of rights language in the Trust Agreement and the SPD indicated the Port's intent to not provide a vested right to retirement welfare benefits in the CBA, we cannot give effect to such an attempted reservation of rights by an employer. In *Jacoby* we held that

> "even though the employer has reserved the right to amend or terminate the plan, once an employee, who has accepted employment under such plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot divest the employee of his rights thereunder."

77 Wn.2d at 916 (quoting *Cantor*, 171 Ohio St. at 410). The obligation to provide a vested right becomes irrevocable when the employee satisfies the eligibility conditions. *See McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 18-19 (1st Cir. 1996) ("[O]nce an employee fulfills the service requirements entitling him or her to retirement benefits under a pension plan, the employee acquires a contractual right to those benefits, and the employer cannot abridge that right despite its aboriginal reservation of a power to effect unilateral amendments or to terminate the plan outright."); *see also* 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 3.16 (Joseph M. Perillo rev. ed. 1993); 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 1.4, at 8 (2007) (noting that a unilateral contract becomes enforceable and irrevocable "when performance has occurred in response to a promise"). The invalidity of reservation clauses is consistent with the compensatory nature of retirement benefits. An employer cannot expect to accept the benefit of continued service from its employees while reserving the right not to compensate those employees once

Port decided to stop funding it. Furthermore, Appellants were not required to exhaust the procedures requirements of the Trust Agreement to contest the denial of benefits as the termination of the Welfare Trust rendered such procedures useless. The federal case law cited by the Port relies on ERISA and does not apply as a matter of state law. *See Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995); *Sarraf v. Standard Ins. Co.*, 102 F.3d 991, 993 (9th Cir. 1996).

it has received the full benefit of their service. *See generally Kulins v. Malco,* 121 Ill. App. 3d 520, 526, 459 N.E.2d 1038, 76 Ill. Dec. 903 (1984) ("When services are rendered, the right to secure the promised compensation is vested as much as the right to receive wages or any other form of compensation, and the lack of a promise to vest does not revoke the employer's obligation to pay." (citation omitted)).

¶44 If the Port wanted to limit its obligation to provide welfare benefits, then it could have insisted on limiting the right to retirement welfare benefits in the CBA itself. Instead, it chose to accept the benefit of the employees' long-term service without establishing that eligible retirees would have no continued right to receive benefits from the Port after the expiration of the CBA. The conferral of such benefits induced the employees to provide service to the Port for the requisite number of years under the reasonable expectation of receiving welfare benefits once they retired. *See Jacoby,* 77 Wn.2d at 915 ("A retirement pension is pay withheld to induce continued faithful service."). The inducement prevented these employees from finding alternative ways to prepare for retirement, either by finding other employment with greater benefits or by negotiating with the Port for higher wages in exchange for the lack of retirement benefits so that they could start their own personal retirement accounts in order to pay for retirement welfare benefit premiums. *See Dorward,* 75 Wn.2d at 483. The employees' agreement to work under such expectations created the vested right to the benefits promised in the CBA. *Bakenhus,* 48 Wn.2d at 701.

¶45 Without limiting the vested right to retirement welfare benefits in the CBA, the Port remains obligated to provide such benefits for the lives of the eligible retirees who satisfied the years of service and contribution requirements before April 30, 2003, the period through which the terms of the CBA extended. The obligation must be comparable to the level of benefits provided at the time the CBA was signed.

## C

¶46 We recognize that administration of a welfare benefits plan requires flexibility to account for changing economic conditions. The *Bakenhus* court specifically recognized that pension plans themselves are flexible concepts that may be modified "for the purpose of keeping the pension system flexible and maintaining its integrity." *Id.* The court was mindful not to impose strict contractual guarantees on employers who provide pensions in order to allow "the freedom necessary to improve the pension system and adapt it to changing economic conditions." *Id.* We believe that the Port's ongoing obligation to provide welfare benefits will require the same kind of flexibility.

¶47 We hold that the obligation to provide vested retirement welfare benefits does not require the Port to revive and fund the Welfare Trust. While the Port used the Welfare Trust as the tool to deliver its obligation to provide benefits, it may continue to fulfill its obligations through another vehicle that provides a sustainable way of delivering benefits reasonably commensurate with the level of benefits promised in the CBA. *Id.* at 701-03. In fact, the Port already offered to enroll Appellants in its own employee benefits plan. The Port could fulfill its obligation by paying the premiums for Appellants to participate in that plan, assuming it offers a reasonably comparable level of benefits. On remand, the trial court may consider the need for flexibility in determining how the Port will fulfill its obligation.

## CONCLUSION

¶48 The trial court held that Appellants had no vested right to receive retirement welfare benefits because the CBA did not "unambiguously" vest the welfare benefits beyond the duration of the CBA itself. The court misconstrued our precedent regarding the creation of a vested

right to retirement benefits. The conferral of compensatory retirement welfare benefits through a CBA creates a vested right for eligible retirees absent express language in the agreement specifically limiting the right to such benefits. For these reasons, we reverse the trial court and remand for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, CHAMBERS, and FAIRHURST, JJ., concur.

¶49 MADSEN, J. (dissenting) — The majority's decision cannot be justified by the parties' written agreement, which expressly allows for change or termination of retiree health care benefits. It cannot be justified by our case law because there is not a single Washington case that applies the implied contract vesting theory on which the majority relies to health care benefits. Nor is there any basis for extending the vesting theory that heretofore has been applied only in the context of pension rights. Pensions are deferred compensation because the benefits are earned during the working years and payable after retirement. In this context an implied vesting rule makes sense. But health care benefits are generally present compensation, not deferred compensation, because the employee actually receives benefits while still employed—he or she does not wait until retirement to begin receiving benefits. If, however, health care coverage is provided for retirees, it is because the parties have contractually agreed to such an arrangement. The majority's rule, however, would impose a vesting requirement on all employment relationships where health care coverage is provided to employees, thereby usurping the parties' right to address retirees' coverage by private contract. The majority opinion imposes a policy choice that more properly lies within the province of the legislature.

¶50 I have great sympathy for the workers in this case, but the fact is that their contractual agreement with the Port does not authorize the benefits they seek. The unfortunate result of the majority opinion is that many employ-

ers will cease providing any health care benefits at all to employees in order to avoid the possibility of incurring an obligation to provide benefits for life—at the least they will cease providing retiree health care benefits. The majority opinion is likely to affect a great many employees who, although not before us in this case, will suffer loss of health coverage and possibly loss of jobs before they acquire vested rights under the majority opinion.

¶51  I dissent.

## ANALYSIS

¶52  The welfare benefits plan at issue is a governmental plan exempt from the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 (Title I). The question is whether the appellants are entitled to vested rights to continuation of substantially the same medical benefits at the same cost as they enjoyed under their collective bargaining agreement and related documents. There is no state or federal statute that applies to answer this question. The great majority of cases addressing the issue of whether a retiree has vested rights to lifetime health care benefits are federal cases that address the question as a matter of contract law. What the court should do is examine the parties' contract to determine whether the parties contractually agreed to vest rights to lifetime health care benefits and, in doing so, the court should follow the lead of federal courts holding that intent to vest lifetime benefits must be clear and express in the parties' agreement.

¶53  The majority, however, refuses to consider the large body of federal case law addressing the issue as a contract matter. Its refusal is on the mistaken ground that the federal cases are tainted by an inference against vesting. The majority also refuses to enforce the parties' contract as written on the ground that a vesting theory previously applied only in pension cases should be substituted for the parties' actual agreement.

¶54 This court frequently considers federal case law when deciding labor cases, and more specifically has found federal labor cases persuasive, but not controlling, when deciding cases under the Public Employees' Collective Bargaining Act (PECBA), chapter 41.56 RCW.[18] *E.g.*, *Nucleonics Alliance, Local Union No. 1-369 v. Wash. Pub. Power Supply Sys.*, 101 Wn.2d 24, 32-33, 677 P.2d 108 (1984) (because PECBA is substantially similar to the National Labor Relations Act, 29 U.S.C. §§ 151-169, Pub. L. No. 74-198, 49 Stat. 449 (1935), as amended, decisions under that act are persuasive, though not controlling). In light of our practice of considering federal labor cases on similar issues, it is appropriate for this court to consider the federal cases in this case insofar as they employ traditional principles of contract interpretation. Other states have considered federal cases when deciding whether under state law there is an obligation to provide lifetime health care benefits to retirees. *See Boyd v. Rockwood Area Sch. Dist.*, 907 A.2d 1157 (Pa. Commw. Ct. 2006); *Davis v. Wilson County*, 70 S.W.3d 724 (Tenn. 2002); *cf. Island Creek Coal Co. v. Wells*, 113 S.W.3d 100 (Ky. 2003) (with respect to long-term disability, another welfare benefit).

¶55 The majority's reasons for declining to do so do not withstand scrutiny. The majority incorrectly concludes that the federal cases apply inferences for or against vesting and are therefore inapplicable under state law and incorrectly concludes that federal courts decide the issue as a matter of "ERISA law." The majority quotes language out of context from some cases in which the federal court in fact applied a traditional contractual analysis and quotes other language that on its face does not suggest that "ERISA law" or any inference drove the federal court's reasoning.

¶56 In fact, many federal courts specifically reject any presumptions or inferences. In *International Union, United Automobile, Aerospace & Agricultural Implement Workers*

---

[18] Pursuant to RCW 53.18.015, the provisions of chapter 41.56 RCW apply to ports, unless provided otherwise.

*of America v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir. 1999), the court stated, "[W]e reject . . . the appellants' invitation to adopt the presumption enunciated in *Yard-Man*."[19] *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). The court explained that because Congress exempted welfare benefits from ERISA's vesting require-ments, " '[i]t . . . seems illogical to infer an intent to vest welfare benefits in every situation where an employee is eligible to receive them on the day he retires.' " *Skinner*, 188 F.3d at 141 (quoting *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988)). The court agreed with the Eighth Circuit that because Congress had taken a neutral position on the issue, traditional rules of contract construction should apply if not inconsistent with federal labor policies, and " *'it is not at all inconsistent with labor*

---

[19] The "*Yard-Man* presumption is . . . an inference that the parties intended benefits to vest" and applies in the context of a collective bargaining agreement. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 773 (6th Cir. 1999); *see Skinner*, 188 F.3d at 140 (under the *Yard-Man* inference, "courts presume that the parties intended retiree welfare benefits to continue for life, notwithstanding the expiration of a collective bargaining agreement"). The Sixth Circuit, in which *Yard-Man* was decided, has taken great pains to explain that the inference is much more limited than had been thought. For example, in *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006), the court observed that the so called *Yard-Man* inference or presumption has generated controversy. The court said the inference arose from language in *Yard-Man* stating that " 'retiree benefits are in a sense "status" benefits which, as such, carry with them an *inference* that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.' " *Id.* (quoting *Yard-Man*, 716 F.2d at 1482). The court pointed out the rest of *Yard-Man* and later Sixth Circuit cases clarified the "inference," stating that it was not a presumption, did not shift the burden of proof to the employer, and did not require specific antivesting language for a court to find no intent to vest benefits. *Id.* The court said that "[t]his court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent." *Id.* at 580. "When other contextual factors so indicate, *Yard-Man* simply provides another inference of intent. *All that* Yard-Man *and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation.*" *Id.* (emphasis added). The majority cites *Yard-Man*, saying that it closely resembles our case law "by focusing directly on the collective bargaining process as the foundation for the employee's expectation," majority at 841 n.13, but fails to acknowledge that *Yard-Man* and its progeny require that ordinary principles of contract interpretation apply. Importing a vesting theory from the pension context that does not appear in the parties' agreement pertain-ing to health care benefits, as the majority does, is a far cry from applying ordinary contract principles and implementing the parties' agreement as written.

*policy to require plaintiffs to prove their case without the aid of gratuitous inferences.'* " *Id.* (emphasis added) (quoting *Anderson,* 836 F.2d at 1517); *see also Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 855-56 (4th Cir. 1994) ("courts may not lightly infer the existence of an agreement to vest employee welfare benefits"; no inference or presumption applied); *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 401-04 (6th Cir. 1998) (reasoning that the plan documents unambiguously reserved the employer's right to amend or terminate the plan; no inference or presumption was applied); *John Morrell & Co. v. United Food & Commercial Workers Int'l Union,* 37 F.3d 1302, 1304 (8th Cir. 1994) (the court construed master agreement provisions and considered the parties' negotiating history; no inference or presumption was applied); *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 937-39 (5th Cir. 1993) (examining plan documents and finding no contractual vesting; "[t]here is nothing in the way of context, inference, or presumption to persuade us otherwise"); *Bland v. Fiatallis N. Am., Inc.,* 401 F.3d 779, 783-84 (7th Cir. 2005) (the question is essentially a question of contract interpretation).

¶57 In addition, far from being a matter of "ERISA law" or any "interpretation of ERISA law," numerous cases are decided on the basis of contract law. *See, e.g., John Morrell,* 37 F.3d at 1304 ("although ERISA is the governing law, this case turns on whether vested health benefits were contractually conferred"). This is not surprising, since Congress determined that in ERISA it would not impose a vesting requirement for welfare benefits, leaving it for the parties to decide.

¶58 Although federal cases address the fact that ERISA does not provide for vested health care benefits, this does not mean the cases are inapposite. It is critical to consider the reasons *why* there is no vesting of welfare benefits under ERISA. Congress rejected automatic vesting of health care benefits under ERISA because of the hardships such a requirement would impose:

Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actu-

arial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.

*Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988).[20] Congress also chose not to require vesting because it would deter employers from establishing welfare benefit plans: Congress "[a]pparently . . . chose not to impose vesting requirements on welfare benefit plans for fear that placing such a burden on employers would inhibit the establishment of such plans." *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990).

¶59 If in ERISA Congress had imposed a vesting requirement for welfare benefits, including health care benefits, it would have imposed an onerous burden, one so onerous that the vesting requirement would act to defeat rather than protect employees' enjoyment of welfare benefits, including health care benefits. This, ultimately, is the reason why federal courts have required as a matter of contractual interpretation that there be clear language of intent to vest rights in lifetime health care benefits before such an obligation will be imposed.

¶60 The same reasons that Congress considered when rejecting a requirement of vesting under ERISA are relevant under state law. Imposing a vesting requirement under state law means that employers must provide lifetime health care benefits in the face of rapidly rising, unpredictable health care costs—costs exacerbated by advances in treatment methods and methodology. A vesting requirement is also very likely to convince employers that it is not wise to establish a health care benefit plan at all, and

---

[20] Also, with regard to ERISA itself, courts also note that " '[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.' " *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir. 1990) (quoting H.R. Rep. No. 93-807, at 60 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4726).

more particularly a retiree health care benefit plan, because to do so might be to incur the obligation to fund a plan whose costs are unpredictable and liable to become exponential. It must be remembered that the majority's "deferred compensation" analysis does not distinguish between present health care coverage and retiree health care coverage, provides no basis for making such a distinction, and provides no hint that only the latter is encompassed by its analysis.

¶61 For the same reasons that federal courts require clear intent to vest, this court should follow their cases and conclude that under state law the appropriate contractual approach is to require clear, express language showing intent to provide vested rights to lifetime health care benefits. *See, e.g., Skinner,* 188 F.3d at 139 (the intent to vest benefits must be stated in clear and express language, because "to vest benefits is to render them forever unalterable"; noting also that welfare plan benefits constitute an extra-ERISA commitment (citing *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 902 (3d Cir. 1995); *Gable,* 35 F.3d at 855; *Sprague,* 133 F.3d at 400; *John Morrell,* 37 F.3d at 1304)); *accord Wise,* 986 F.2d at 937-38 ("[c]ontractual vesting is a narrow doctrine . . . [p]laintiffs must assert strong prohibitory or granting language"); *Bland,* 401 F.3d at 784 ("[u]pon vesting, benefits become forever unalterable, and because employers are not legally required to vest benefits, the intention to vest must be found in 'clear and express language' in plan documents" (quoting *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry.,* 520 U.S. 510, 515, 117 S. Ct. 1513, 137 L. Ed. 2d 763 (1997))).

¶62 Courts in other states have reached this same conclusion, following the federal analysis. *See, e.g., Island Creek Coal Co.,* 113 S.W.3d 100 (there must be strong granting language because extra-ERISA commitments must be clearly and expressly stated; no vested right to receive long-term disability payments); *Boyd,* 907 A.2d at 1165 (vested benefits must be established

by clear and express language); *Davis*, 70 S.W.3d at 727 ("welfare benefits may be modified or terminated at any time unless . . . the employer expressly provided that the benefits were intended to vest or were not to be terminated").

¶63 We should be assured in every case that the parties clearly intended that lifetime health care benefits vest. Here, there is no express language showing intent to vest rights to lifetime health care benefits. That should be the end of the case. In fact, the parties' agreement expressly shows the opposite—there was no intent that these benefits vest.

¶64 Before turning to the parties' agreement, two additional points are important. First, the majority severs the collective bargaining agreement itself from other related documents and reads it in isolation. But as explained below, the collective bargaining agreement expressly refers to the other documents and it should be interpreted as incorporating the relevant documents by reference. *See, e.g., W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 494, 7 P.3d 861 (2000) (incorporation by reference). Moreover, because the duties and obligations of the parties in relation to the health care plan are set out in several documents, they must be read together to determine what the parties agreed.

¶65 Second, under state law the burden of proving that the employer intended the benefits to vest must be placed on the plan participant. *See generally Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 133-36, 769 P.2d 298 (1989) (burden of persuasion in a breach of employment contract case is on the plaintiff, and this "comports with general burden of proof rules requiring the plaintiff to prove all elements of the cause of action"). *Cf., e.g., Skinner*, 188 F.3d at 138-39.

¶66 Bearing these principles in mind, the beginning point is the language of the collective bargaining agreement between the Port of Seattle (Port) and the International Longshore and Warehouse Union Local 9 Deter-

mining whether the Port is contractually obligated to provide lifetime health care benefits at little or no cost hinges on the intent of the parties as expressed in the documents that bind them. The collective bargaining agreement on which the parties rely includes "SECTION XVIII," which governs "WELFARE" and states in full:

> The Port shall maintain the current level of medical, welfare, dental and related benefits during the duration of this contract and shall continue to provide the same level of coverage currently provided to eligible employees, eligible retirees, and dependents. *The Port agrees to be party to the Agreement and Declaration of Trust of the ILWU Local 9 Warehouse Welfare Trust Fund*, and to pay the premium necessary to maintain the current level of benefits to that Trust. Quarterly work hour reports are due and payable the 15th of the month following the end of each quarter.

"AGREEMENT between PORT OF SEATTLE and INTERNATIONAL LONGSHORE and WAREHOUSE UNION, LOCAL # 9" covering "July 1, 1997 – June 30, 2000" (hereinafter collective bargaining agreement), Ex. 1 to Aff. of Richard Birmingham, Clerk's Papers (CP) at 52 (emphasis added).

¶67 The first sentence of this section contains two clauses. The first is the Port's promise to maintain the "current level of medical, welfare, dental, and related benefits." This clause thus identifies *what benefits* will be provided, i.e., the same benefits that had been provided, specifically medical, welfare, dental, and related benefits, and it identifies the *duration* of the benefits, i.e., *during the period the collective bargaining agreement applies*. The second clause tells *who will receive the benefits*, specifically, eligible employees, eligible retirees, and dependents, and also makes clear that each category will continue to receive the same level of coverage currently provided. Contrary to the majority's strained construction, the words "shall continue to provide" mean that the Port promises that benefits preexisting this collective bargaining agreement will continue to be provided to the identified classes, not that the

Port promises that it will provide benefits beyond the duration of the collective bargaining agreement.

¶68 This reading is the only reasonable one given the reference in the second clause to "employees." The Port's promise to provide benefits to "employees" *and* "retirees," as opposed to just "retirees," makes sense only if the promise is limited to the contractual period of the collective bargaining agreement itself—no employer would agree to provide health care coverage to active employees beyond the term of their agreed services. As one court has explained, the phrases "shall remain" and "will continue" when read in context are used in the parties' collective bargaining agreements to indicate a continuation of prior practices and policies, not to provide such coverage prospectively. *Skinner*, 188 F.3d at 143. The court said this conclusion was supported by the fact that the representation that the employer would continue benefits appeared to apply to both active employees and retirees. *Id.* at 143-44. Because health care benefits did not vest for active employees, and the collective bargaining agreement made no material distinction between active employees and retirees, the only reasonable conclusion was that health care benefits for retirees did not vest either. *Id.* at 144.

¶69 Here, since the clause refers to retirees *and* active employees, the only reasonable way to read it is that the Port's promise to provide health care benefits to employees through the term of the collective bargaining agreement is the same promise it made to retirees: a promise to provide health care benefits through the term of the collective bargaining agreement. The collective bargaining agreement does not promise benefits beyond the period covered by the collective bargaining agreement to current employees. "Shall continue to provide" is thus not a promise of indefinite duration, i.e., lifetime benefits, for retirees any more than it is for active employees. It is instead a promise of continuing such benefits as had previously been provided and continuing them only for the duration of the collective bargaining agreement. So too, the promise by the Port to

"continue to provide" must be read the same way—that the benefits will continue only for the duration of the agreement.

¶70 In *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 134 (2d Cir. 1999), the court considered language in an insurance agreement that had been incorporated by reference into the parties' collective bargaining agreement and provided that "insurance *'will be provided* for employees receiving or becoming entitled to receive pension payments.'" (Emphasis added.) The court held, "These statements cannot reasonably be read as binding Curtiss-Wright to vest the benefits at issue." *Id.* Similarly, in *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 668 (6th Cir. 1998), the court rejected plaintiffs' claim that intent to vest was shown by language stating that "'if you retire and are eligible for a pension you shall continue to have the same health coverage,'" saying that it "neither expressly guarantees lifetime benefits nor creates an ambiguity as to whether such benefits are vested."

¶71 The language in the collective bargaining agreement here shows even less intent to provide for vested rights than language other courts have held does not show intent to vest. For example, in *Wise*, 986 F.2d at 937-38, the court found no intent to show vesting of health care benefits in language stating that "'[u]pon retirement, you . . . are automatically insured for retirement health care benefits and the Company pays the entire cost.'" (Alterations in original.) The court said this language "discussed what the Plan then provided, not whether it would be offered in perpetuity." *Id.* at 938. And in *Skinner*, 188 F.3d at 141, as noted the court concluded that phrases "'will continue'" and "'shall remain'" did not clearly and expressly indicate vesting since there was no durational language to qualify the phrases, such as language stating that benefits "'will continue for the life of the retiree,' or that they 'shall remain unalterable for the life of the retiree.'" Indeed, here, in contrast, the words "will continue to provide" *are* in a sentence having durational language, but durational lan-

guage showing that benefits were not intended to continue after the parties' collective bargaining agreement ended.

¶72  Section XVIII of the collective bargaining agreement contains additional terms. The second sentence states that the Port is a party to the Welfare Trust Agreement. The collective bargaining agreement therefore explicitly defines the obligations of the Port to include the terms of Welfare Trust Agreement. It states that the Port will be party to the Agreement and Declaration of Trust of ILWU Local 9 Warehouse Trust Fund (Welfare Trust Agreement) and *will have to pay premiums necessary to maintain current benefits*. This sentence is extremely important because it shows that the union-employees and the Port agreed that the terms of the Welfare Trust Agreement describe the Port's obligations under the collective bargaining agreement.

¶73  The Welfare Trust Agreement contains several provisions that bear on the scope of the promises binding the Port. It describes the Trust Fund's purpose to provide an entity for "participating employers" to pay contributions and through which the Welfare Trust Board of Trustees (Trustees) "can create and administer one or more employee welfare benefit plans for the participating employees on whose behalf the contributions have been paid." CP at 91. It defines "welfare benefits" or "employee welfare benefits" as "the benefits provided in an employee welfare benefit plan established by the Board of Trustees." CP at 93. The Welfare Trust Agreement provides for joint administration by an equal number of employer and labor organization Trustees. CP at 94. Among other powers, the Trustees have "full and exclusive authority to control and administer the Trust Fund and the employee welfare benefit plans which they create." CP at 107. They also "have the authority to determine the details of the benefit plans, *including the determination of rules under which participating employees shall be eligible for benefits and the nature and amount of*

*such benefits." Id.* (emphasis added).[21] Because the Port was by contractual agreement a party to the Welfare Trust Agreement, it was a party to this term, which specifically states that the trustees had authority to determine the "nature" of the benefits, as well as the amounts. In the agreement, "participating employee" is defined to include those covered by a collective bargaining agreement and for whom the employer makes contributions to the Trust Fund and "any individual who may have been so employed but is subsequently . . . retired." CP at 92.

¶74 Thus, by agreeing in the collective bargaining agreement that the employer will be bound by the Welfare Trust Agreement, the parties agreed that the Port would be subject to discretion in the Trustees to determine the details of benefits plans, including eligibility requirements and the nature and amount of benefits. Necessarily, this includes the discretion to change these terms and conditions of the benefit plan. *See Boyd,* 907 A.2d at 1166 (where the parties' collective bargaining agreement included a provision to establish a labor-management committee to develop an acceptable health care program, the contract contemplated that plan coverage was subject to change).

¶75 As mentioned earlier, the Welfare Trust Agreement also states that it will automatically terminate "upon the expiration of all collective bargaining agreements and special agreements requiring the payment of contributions to the Trust Fund." CP at 119. Thus, the Welfare Trust Agreement to which the Port is bound plainly acknowledges that all welfare benefit plans administered under its terms can automatically terminate. Accordingly, by binding the Port to the Welfare Trust Agreement, the parties to the collective bargaining agreement contemplated the possibility that welfare benefits under the Welfare Trust Agree-

---

[21] The Trustees also "have the authority to determine whether benefits shall be extended to beneficiaries of participating employees and, if so, to determine which class or classes of beneficiaries shall be eligible for benefits, the eligibility rules which will apply to such class or classes of beneficiaries, and the nature and amount of such benefits." CP at 107.

ment could terminate upon termination of collective bargaining agreements.

¶76 The Welfare Trust Agreement also provides:

> The Trustees may, if deemed appropriate, prepare and file with the Department of Labor a summary plan description and any modifications or changes in the information contained in such description.
>
> The Trustees shall also furnish to participating employees and to each beneficiary receiving benefits copies of the summary plan description and copies of any modifications or changes in the information in such description.

CP at 103-04. In accord with this provision, the appellants were provided a summary plan description, which the parties also rely on. This document, "SUMMARY PLAN DESCRIPTION for I.L.W.U. LOCAL 9 WELFARE TRUST FUND," effective April 1, 1998 (the summary plan description), CP at 331, discloses the details of the plan applying to the plaintiffs. It states that the program is not guaranteed:

> The Board of Trustees is providing health and welfare benefits to the extent that monies are currently available to pay the cost of such programs. The Board of Trustees retains sole and exclusive authority, at its discretion, to determine the extent, if any, to which monies are available for this program and to determine the manner of expenditure of such monies for the program. *The program is not guaranteed to continue indefinitely. The Board of Trustees reserves the right to change the eligibility rules of the benefits, reduce the benefits, or eliminate the Plan entirely for active employees, retirees, or both, as may be required by future circumstances.*
>
> The Board of Trustees has the sole discretionary authority to determine eligibility for benefits and to interpret the terms of this Plan.

CP at 334 (emphasis added). The summary plan description (SPD) also explains, as to active employees, that coverage will terminate, unless otherwise required by law, at the earliest of several events, including, among others, the date the plan terminates and the date the employer ceases to

make contributions or premium payments. CP at 343. As to retired employees, the SPD states in a bolded, italicized paragraph:

*Benefits under this Retired Employee program are not guaranteed for any definite period of time and benefits will be provided only to the extent that sufficient funds are available in the Trust. The Trustees reserve the right to make any changes in this retiree Plan they deem necessary, and to terminate the retiree Plan.*

CP at 348.

¶77 As provided in the Welfare Trust Agreement, the Trustees established requirements for eligibility for retired employee benefits, which are set out in the SPD. Eligibility for benefits for those who opted for early retirement at age 62 required 15 years of creditable service, and normal retirement at age 65 required 25 years of service; in each case, employer contributions to the Trust Fund had to have been paid on the employee's behalf for a minimum of 10 years. CP at 347. The SPD established self-payments for health care benefits dependent on retirement eligibility and years of service.

¶78 The eligibility requirements and other provisions in the SPD were obviously coordinated with the Warehouse Pension Trust Fund Industry Pension Agreement (Industry Pension Agreement), which was an amendment to and incorporated by reference into the collective bargaining agreement. The pension agreement states that employees who elect to retire before age 62 are not eligible for retiree health and welfare benefits until they reach age 62, at which time "benefits will be provided under the terms and conditions that are in effect at the time of entitlement." CP at 300 (agreement dated Feb. 7, 1997).

¶79 This provision in the Industry Pension Agreement plainly contemplates that benefits could vary, depending on what terms and conditions were in effect at the time of an individual's retirement, and changes made by the Trustees in accord with plan documents. The Industry Pension

Agreement thus accords with the terms of the Welfare Trust Agreement, which, as noted, provides for the Trustees exercising discretion to determine available benefits and eligibility requirements. It also accords with terms and conditions outlined in the SPD, including the terms explaining that benefits could be changed or terminated depending upon future circumstances, including the sufficiency (or lack) of funds.

¶80 Importantly, becoming eligible for benefits under the SPD is not the same as becoming vested in rights to lifetime health care benefits. Rather, unless a retiree meets the eligibility requirements, he or she is not entitled to any benefits under the plan at all. If he or she meets the requirements, then health care benefits are available under the plan—which includes the terms stating the possibility that the plan may be amended or terminated.

¶81 Thus, all of the plan documents consistently recognize that health care benefits are subject to change or termination. This could happen through expiration of the collective bargaining agreement or through amendment or termination of the plan. There is no language in any of the documents expressly stating that employees will have vested rights to lifetime health care benefits.

¶82 The appellants maintain, however, that the reservation of rights language in the SPD is ineffective and the majority agrees. Initially, it is clear the reservation of rights language applies. The collective bargaining agreement contractually requires the Port's agreement to the Welfare Trust Agreement, and the Trustees issued the SPD in compliance with that agreement. The appellants argue, however, that the reservation of rights language contravenes this court's holding in *Jacoby v. Grays Harbor Chair & Manufacturing Co.*, 77 Wn.2d 911, 468 P.2d 666 (1970), that a reservation of rights clause will not be given effect to divest an employee's vested rights.

¶83 *Jacoby* is founded on the implied contract theory set out in *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956), under which pensions are deferred compensa-

tion for services rendered and the employee therefore has vested rights in pension benefits. *Jacoby*, 77 Wn.2d at 916. It was in this context that the court in *Jacoby* held that a reservation of rights clause is ineffective to overcome the vested right.

¶84 However, every case this court has decided in the *Bakenhus* line has involved pension rights and the effect of various employer actions on pension rights. The court has *never* applied the *Bakenhus* analysis to health care benefits, and it should not do so here.[22] While the majority quotes a great deal of language from this court's cases, there is no precedent compelling its result. Not one single case applies the *Bakenhus* vested rights theory outside the pension context, and the two cases outside this context that the majority quotes plainly do not support its result. First is *International Association of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 45 P.2d 186 (2002). The majority's references to this case seem to favor its analysis. The majority says that the court did not distinguish between pension and other benefits, but instead focused on the total compensation package that the parties negotiated in the collective bargaining process. The majority reasons that accordingly health care benefits that are compensatory must be subject to the *Bakenhus* rule just as pension benefits that are compensatory are subject to *Bakenhus*.

¶85 But the majority leaves out critical facts. *Firefighters* does not support the majority's approach, and in fact it supports my conclusion that the collective bargaining agreement and related documents control the issue in this case.

---

[22] This court's cases upon which the majority relies are pension cases. *Crabtree v. Dep't of Ret. Sys.*, 101 Wn.2d 552, 681 P.2d 245 (1984) (pension under teachers' statutory retirement system); *Bakenhus*, 48 Wn.2d 695 (pension under public employees' statutory retirement system); *Dorward v. ILWU-PMA Pension Plan*, 75 Wn.2d 478, 452 P.2d 258 (1969) (pension plan benefits under a collective bargaining agreement); *Farver v. Dep't of Ret. Sys.*, 97 Wn.2d 344, 644 P.2d 1149 (1982) (pension under Washington State Patrol statutory retirement system); *Frank v. Day's, Inc.*, 13 Wn. App. 401, 535 P.2d 479 (1975) (accumulations due under employer's pension trust fund); *Jacoby*, 77 Wn.2d 911 (employer's pension plan).

¶86 There were two issues in *Firefighters*. The first was whether the employer had to refund contributions it made to its employees' Social Security and Medicare accounts from 1995 through 1998. This involved past payments made by the employer to the government for these purposes on behalf of the employees. The second issue was whether the employer had to continue to make comparable contributions to the employees' pension accounts under that part of the *Bakenhus* analysis that states that if changes are made with respect to a pension plan that disadvantages the employee, there must be a corresponding benefit provided. *Bakenhus*, 48 Wn.2d at 703. But, and here is where the majority's reliance on the case fails, this second question was limited to whether the employer had to "fund the employees' pension plan *for the duration of the collective bargaining agreement*, which expired on December 31, 2000." *Firefighters*, 146 Wn.2d at 218 (emphasis added); *see id*. at 210. That is, the issue was whether the employer had to provide such benefits *during the period covered by the collective bargaining agreement*.

¶87 Because payments to the employees' Social Security and Medicare funds were compensation agreed to through the collective bargaining negotiation process, the court held, as to the first issue, that the employer's share of Social Security and Medicare fund contributions had to be refunded to the employees. The court held, as to the second issue, that the employer had to "fund the employees' pension plan *for the duration of the collective bargaining agreement*" because that would provide equivalent compensation in lieu of Social Security and Medicare contributions for the period covered by the collective bargaining agreement, i.e., a corresponding benefit. *Id*. at 224 (emphasis added).

¶88 *Firefighters* thus stands for the proposition that if, based on the evidence, a particular benefit is compensatory in nature, then the employer cannot withhold those benefits when the employee has performed the services for which the compensation is due. But *Firefighters did not address*

*any obligation to pay any benefits for life or any issue related to vesting of lifetime benefits*. It was specifically limited to a past period of time for which the employer obtained refunds of Social Security and Medicare moneys from the government after the fire fighters opted out of the system and for which the employees claimed these refunds, and the period of time remaining under the parties' collective bargaining agreement in effect at the time suit was filed. *Firefighters* simply does not support the majority's view that all forms of compensation existing at the start of an employee's relationship with the employer are subject to vesting for life. *Firefighters* does not say or even suggest that any benefits that are compensatory in nature are, merely because they are compensatory, vested for life.[23]

¶89 To the contrary, *Firefighters* supports my dissent.

¶90 *Firefighters* also directly contradicts the majority in another respect. The majority relies on *Dorward v. ILWU-PMA Pension Plan*, 75 Wn.2d 478, 452 P.2d 258 (1969), where the court applied the *Bakenhus* analysis to cover pensions specifically created through collective bargaining. But while pension benefits under a collective bargaining agreement may vest, as in *Dorward*, *Firefighters* shows that other benefits can be limited to the terms of a collective bargaining agreement.

¶91 The second case decided by this court that the majority relies on that is not a pension case is *Cockle v. Department of Labor & Industries*, 142 Wn.2d 801, 16 P.3d 583 (2001). The majority cites this case as recognizing that employer-provided health care benefits are core, nonfringe

---

[23] The majority erroneously believes I read *Firefighters* as involving benefits provided by contract and therefore limited to the term of the contract. Then, having set up this "straw man," the majority knocks it down, saying this reading is "misplaced." Majority at 837 n.10. However, the majority misstates my analysis. As I explain, the problem with the majority's reliance on *Firefighters* is that this court agreed that the employer had to provide compensation equivalent to Social Security and Medicare contributions for the duration of the collective bargaining agreement *because that was the period for which the compensation was due*. As correctly stated herein, *Firefighters* does not suggest that concluding that benefits are compensatory requires also concluding that benefits are deferred compensation payable for the lifetime of the employee.

benefits that are provided in consideration for the purposes of calculating lost wages in the workers' compensation statute. The majority reasons the case supports its claim that health care benefits can take the form of deferred compensation when negotiated through collective bargaining. The majority fails to note that in a successor case, *Gallo v. Department of Labor & Industries*, 155 Wn.2d 470, 491, 120 P.3d 564 (2005), the court held that "retirement benefits" are *not* wages for the purpose of the same workers' compensation statute. Obviously the majority reads far too much into *Cockle*, because if *Gallo* is read in the same way, it would have to be read to mean that retirement benefits cannot take the form of deferred compensation through collective bargaining. This would be, of course, nonsensical. *Cockle* is completely inapposite.

¶92 There is another flawed theme running through the majority's analysis. The majority speaks of the cases in the *Bakenhus* line as concerning the vested right to "retirement benefits." Majority at 834. By misrepresenting what the cases concern, the majority easily encompasses any possible retirement benefit within the *Bakenhus* line. But this sleight of hand cannot change precedent, and the fact remains that all of the cases have involved pension rights, until today, when the majority turns the theory on its ear. The sleight of hand cannot change the past but, sadly, it alters the future.

¶93 The majority's analysis also upsets employers' and employees' ability to privately negotiate a term that they should be entitled to negotiate. It must be remembered that the *Bakenhus* "implied contract" theory is a *contract* theory. Here, one can look to the *parties' agreement* to determine whether they have a contract providing for vested rights in lifetime health care benefits. The parties have already established the contract terms and this court has the written documents expressing the agreement of the parties. The court's responsibility is to enforce the contract as written, not to imply a contract that is contrary to the terms of the contract that the parties actually entered.

¶94 Reservation of rights clauses should also be given effect because, as other courts have concluded, they evidence the employer's intent that no vested benefits have been promised. For example, courts have even rejected claims of vested rights where contracts described "lifetime" benefits or benefits "for life" if they also contain reservation of rights clauses permitting the employer to amend to terminate the plans. *E.g., In re Unisys*, 58 F.3d at 902; *Vallone v. CNA Fin. Corp.*, 375 F.3d 623 (7th Cir. 2004). In *Unisys*, 58 F.3d at 904, the court explained:

> An employer who promises lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist. [The] retirees' eligibility for benefits was qualified because it was subject to [the employer's] reserved right to terminate the plan under which the benefits were provided.

Similarly, in *Vallone*, 375 F.3d at 633, the court stated, "Reading the document in its entirety, the clauses explain that although the plan in its current iteration entitles retirees to health coverage for the duration of their lives . . . , the terms of the plan—including the plan's continued existence—are subject to change at the will of [the employer]."[24] (Second alteration in original.)

¶95 As explained, the SPD's reservation of rights is completely in accord with the Welfare Trust Agreement and the discretion it lodges in the Trustees. It is also consistent with the collective bargaining agreement, which itself does *not promise any benefits beyond the term of the collective bargaining agreement itself* (and any extensions agreed to by the parties, of course). The reservation of rights language is evidence that the parties did *not* contemplate vested rights in retiree health care benefits.

---

[24] In contrast, where a promise of "lifetime" benefits was made and no reservation of rights was included in the plan documents, the Seventh Circuit found the contract ambiguous as to whether some or all of retiree benefits vested. *Bland*, 401 F.3d 779.

¶96 Contrary to the majority's bald statement that there is no principled basis on which to distinguish between pension benefits and welfare benefits that include health care benefits, there are highly significant differences between the two that counsel against extending the *Bakenhus* theory to health care benefits. First, unlike pensions, which usually involve generally predictable amounts reasonably reflecting deferred compensation for services rendered, health care is a changeable concept. Health care coverage changes and expands as new procedures and treatment are adopted and become part of reasonably necessary health care, and health care costs are extremely volatile—in recent times they have risen far, far in excess of cost of living increases generally. This court should not impose the obligation of vested rights by extending the *Bakenhus* theory of deferred compensation to encompass health care benefits and by denying recognition of reservation of rights clauses. Instead, it should find an obligation to provide lifetime health care benefits only when an employer clearly and unequivocally agrees to provide vested health care benefits.[25]

¶97 Second, although the majority repeatedly equates pensions and welfare benefits such as health care benefits, saying that both are compensatory and therefore must be treated the same, the two are not equivalent. The purpose of pension benefits is to provide retirement income; by their nature pension benefits are not payable to the employee in the usual course of events until retirement. As the court said in *Bakenhus*, pension benefits are in the nature of *deferred* compensation. *Bakenhus*, 48 Wn.2d at 698 ("[i]n this state, a pension granted to a public employee is not a gratuity but is deferred compensation for services ren-

---

[25] The majority's reference to flexibility in pension benefits should not be confused with the unpredictability and volatile costs associated with health care coverage. Flexibility in the *Bakenhus* analysis refers to the ability to make changes in pension benefits as needed for administrative and other reasons, with the concomitant obligation to make other changes that provide an equivalent benefit to the employee/retiree should the change to the pension benefits be one having a negative impact on the employee/retiree.

dered"). But while employer-provided health care benefits are compensatory, they are *immediately* compensatory in the normal course of events. An employee obtains benefits from health care coverage while still employed—if he or she comes down with the flu, he or she can go to a health care provider and immediately obtain benefits pursuant to the employer's provision of health care coverage. The employee does not have to wait until retirement. Unlike the case with pension benefits, the fact that health care benefits are compensatory in nature does not make them a form of *deferred* compensation. Thus, saying that health care benefits are compensatory does not resolve the issue in this case—whether they must be provided for life.

¶98 Although health care coverage is generally present compensation for employees, this does not mean the parties cannot by agreement provide for health care coverage for retirees. Hence the importance of what a collective bargaining agreement actually says, and the importance of looking to the parties' agreement to see whether they expressly agreed to retiree health care benefits, and, if so, for what period of time. Only if there is clear, express language showing the intent to vest lifetime retiree health care benefits should a court conclude that they vest.

¶99 The majority also maintains, however, that employees are powerless to assure that benefits will exceed the period of their collective bargaining agreement, given that the employees have no right to negotiate for continued benefits after retiring. This hypothetical predicament is of the majority's own doing however, and several courts have dismissed this specific argument. As one court stated, "[T]hose who fear that their unions will not bargain for continued benefits for retirees need only see to it that specific vesting language protecting those benefits is incorporated into collective bargaining agreements." *Skinner*, 188 F.3d at 141. In other words, the employee has only to see to it that the parties' agreement includes a provision for vested rights to lifetime health care benefits. If the employer declines, the parties have not had a meeting of the

minds on the issue and this court should not impose an obligation never agreed to.

¶100 And if the court does impose a vesting requirement despite the lack of an agreement, then it is clearly taking for itself a policy decision that belongs in the hands of the legislature. Ultimately, in the absence of anything in the parties' agreement that states that a vested right to health care benefits for life is intended by the employer, the court is asserting itself as a super-legislature. The court should refrain from overstepping its constitutional role in this way.

¶101 When all of the documents that comprise the parties' agreement are considered as a whole, it is obvious that no promise was made by the Port to provide lifetime benefits to retirees. Instead, the Port promised to make contributions to the Welfare Trust Fund for the duration of the collective bargaining agreement for the purpose of funding retiree health care benefits, and no more.[26] At a minimum, there is no express language affirmatively showing intent to vest lifetime health care benefits. Once the collective bargaining agreement and agreements requiring payment of contributions ended, the Welfare Trust Fund automatically terminated. At the same time, and as an alternative basis for cessation of welfare benefits, the Board of Trustees did not abuse discretion in terminating the plan, in light of expiration of the collective bargaining agreement and the Port's termination of contributions.

## CONCLUSION

¶102 The court should conclude that the question of whether the Port promised vested rights to receive medical benefits beyond the end of the collective bargaining agree-

---

[26] The record contains the testimony of plaintiffs who stated their belief that they were entitled to medical care for life. None was able to point to any document embodying a promise by the Port to provide such benefits, however. Courts have rejected similar testimony of plaintiffs-employees and union officials as extrinsic evidence that cannot create ambiguity where there otherwise is none. *E.g., Skinner*, 188 F.3d at 145-47; *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995).

ment depends upon the intent of the parties as expressed in the collective bargaining agreement and the related documents. The express language in all of the plan documents consistently recognizes that health care benefits are subject to change or termination through expiration of the collective bargaining agreement or through amendment or termination of the plan. Most importantly, there is no express language showing the parties intended that rights to lifetime benefits vest. The court should uphold the reservation of rights provision because it does not come within the proscription of a reservation of rights clause in the case of pension rights that vest under an implied contract theory. The *Bakenhus* theory of implied contractual vested rights should not be extended to cases involving health care benefits. The court should hold that the health care benefits plan, including the provisions for retiree health care benefits, was lawfully terminated and the appellants do not have vested rights in retiree health care benefits.

¶103 The court should affirm the trial court's grant of summary judgment in favor of the Port. Because it does not, I dissent.

SANDERS and J.M. JOHNSON, JJ., and BRIDGE, J. PRO TEM., concur with MADSEN, J.

Reconsideration denied June 4, 2009.